IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

XAVIER S.,                              )
                                        )
                    Plaintiff,          )
                                        )
v.                                      )        Civil Action No. 1:19cv1195 (JFA)
                                        )
ANDREW SAUL,                            )
Commissioner of Social Security,        )
                                        )
                    Defendant.          )
_____)

FILED

MAR 2 2020

CLERK, U.S. DISTRICT COURT
ALEXANDRIA, VIRGINIA

### MEMORANDUM OPINION

This matter is before the court on cross-motions for summary judgment. (Docket nos. 13,

19). Pursuant to 42 U.S.C. § 405(g), plaintiff seeks judicial review of the final decision of

Andrew Saul, Commissioner of the Social Security Administration ("Commissioner"), denying

plaintiff's claim for Disability Insurance Benefits ("DIB") and Supplemental Security Income

("SSI") under the Social Security Act. The Commissioner's final decision is based on a finding

by the Administrative Law Judge ("ALJ") and Appeals Council for the Office of Disability

Adjudication and Review ("Appeals Council") that plaintiff was not disabled as defined by the

Social Security Act and applicable regulations.[1]

On December 21, 2019, plaintiff filed a motion for summary judgment (Docket no. 13), a

memorandum in support (Docket no. 14), and a waiver of hearing (Docket no. 15). Thereafter,

following a brief extension (Docket nos. 17, 18), the Commissioner submitted a cross-motion for

_____

[1] The Administrative Record ("AR") in this case has been filed under seal, pursuant to
Local Civil Rules 5 and 7(C). (Docket no. 11). In accordance with those rules, this
memorandum opinion excludes any personal identifiers such as plaintiff's social security number
and date of birth (except for the year of birth), and the discussion of plaintiff's medical
information is limited to the extent necessary to analyze the case.

summary judgment (Docket no. 19), a memorandum in support (Docket no. 21), a memorandum in opposition (Docket no. 22), and a waiver of hearing (Docket no. 20). Plaintiff filed his response to the Commissioner's cross-motion on February 7, 2020. (Docket no. 23).

For the reasons set forth below, plaintiff's motion for summary judgment (Docket no. 13) is granted in part; the Commissioner's motion for summary judgment (Docket no. 19) is denied; and the final decision of the Commissioner is vacated and remanded pursuant to the fourth sentence of 42 U.S.C. § 405(g).

## I. PROCEDURAL BACKGROUND

Plaintiff filed concurrent applications for DIB and SSI in 2013, with an alleged onset date of July 1, 2006. (AR 317–29). The Social Security Administration initially denied plaintiff's applications on February 20, 2014. (AR 189–98). Subsequently, plaintiff requested a hearing before an ALJ. (AR 199–200). The Office of Disability Adjudication and Review acknowledged plaintiff's request for a hearing on March 13, 2014 (AR 201–02) and on February 4, 2016 notified plaintiff that the hearing was scheduled for March 24, 2016 (AR 225–31).

On the scheduled date, ALJ Michael A. Krasnow held a hearing in Washington, D.C., and plaintiff appeared with his attorney, Thomas Sutton.[2] (AR 90). Plaintiff provided testimony and answered questions posed by the ALJ and plaintiff's attorney. (AR 92–124). A vocational expert also answered questions from the ALJ.[3] (AR 125–27). On May 11, 2016, the ALJ issued his decision denying plaintiff's claims for DIB and SSI. (AR 154–75). In reaching his decision, the ALJ concluded that plaintiff was not disabled under either Title II (sections 216(i) and 223(d)) or Title XVI (section 1614(a)(3)(A)) of the Social Security Act. (AR 175). Specifically, the ALJ found plaintiff's substance use disorder a contributing factor material to the

---

[2] Plaintiff appointed Mr. Sutton as his representative on July 29, 2013. (AR 185).
[3] Mr. Sutton elected not to ask the vocational expert any questions. (AR 127).

determination of disability and that plaintiff would not be disabled if he stopped the substance use. (*Id.*). On July 6, 2016, plaintiff's attorney sent a letter to the Appeals Council requesting review of the ALJ's decision. (AR 255–56). On September 22, 2017, the Appeals Council granted plaintiff's request for review under the abuse of discretion provision of the Social Security Administration regulations and vacated the ALJ's decision. (AR 181–82). The Appeals Council found that the ALJ did not provide a good reason for denying plaintiff's father an opportunity to testify at the hearing and that allowing him to submit a written statement after the hearing did not satisfy the requirement "to make every reasonable effort" to accommodate his request to testify. (*Id.*). The ALJ's decision was remanded for a second hearing to provide an opportunity for plaintiff's father to testify and for the ALJ to evaluate that testimony in accordance with the applicable regulations. (AR 182). On February 12, 2018, the Office of Disability Adjudication and Review notified plaintiff that the second hearing was scheduled for May 1, 2018. (AR 282).

On May 1, 2018, ALJ Krasnow held a second hearing in Washington, D.C. (AR 44). Plaintiff appeared with his attorney, Mr. Sutton. (*Id.*). Plaintiff provided testimony and answered questions posed by the ALJ and plaintiff's attorney. (AR 48–69). A vocational expert also answered questions from the ALJ and plaintiff's attorney. (AR 69–72). Pursuant to the Appeals Council's remand, plaintiff's father testified, responding to questions from both the ALJ and plaintiff's attorney. (AR 74–85). On August 7, 2018, the ALJ issued his decision again denying plaintiff's claims for DIB and SSI under the Social Security Act. (AR 18–37). Plaintiff's attorney requested review of the ALJ's decision on October 4, 2018. (AR 13). On July 19, 2019, the Appeals Council denied plaintiff's request. (AR 1–3). As a result, the decision rendered by the ALJ became the final decision of the Commissioner. (AR 1). *See* 20

C.F.R. §§ 404.981, 416.1481. Plaintiff was given sixty (60) days to file a civil action challenging the decision. (AR 2).

On September 17, 2019 plaintiff timely filed this civil action seeking judicial review of the Commissioner's final decision pursuant to 42 U.S.C. § 405(g). (Docket no. 1). Thereafter, the parties agreed to refer this matter to the undersigned magistrate judge for resolution. (Docket nos. 5, 8). On November 18, 2019, the parties filed a joint motion to set the briefing schedule, which the court granted on the same day. (Docket nos. 7, 9). This case is now before the court on cross-motions for summary judgment. (Docket nos. 13, 19).

## II. STANDARD OF REVIEW

Under the Social Security Act, the court will affirm the Commissioner's final decision "when an ALJ has applied correct legal standards and the ALJ's factual findings are supported by substantial evidence." *Mascio v. Colvin*, 780 F.3d 632, 634 (4th Cir. 2015) (quoting *Bird v. Comm'r of Soc. Sec. Admin*, 699 F.3d 337, 340 (4th Cir. 2012)). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Mastro v. Apfel*, 270 F.3d 171, 176 (4th Cir. 2001) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). It is "more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Id.* (internal quotations and citations omitted). In determining whether a decision is supported by substantial evidence, the court does not "undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the Secretary." *Id.* (alteration in original) (quoting *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996)). It is the ALJ's duty to resolve evidentiary conflicts, not the reviewing court, and the ALJ's decision must be sustained if supported by substantial evidence. *Smith v. Chater*, 99 F.3d 635, 638 (4th Cir. 1996).

4

## III. FACTUAL BACKGROUND

### A.     Plaintiff's Age, Education, and Employment History

Plaintiff was born in 1984 and was thirty-three years old at the time of the second ALJ hearing on May 1, 2018. (AR 30, 48). He attended high school but did not graduate. (AR 30, 528). While at school, plaintiff was enrolled in special education classes for difficulties in comprehension and concentration. (AR 528). Plaintiff's first employment was with Delmac of Broomall Inc. in 2000 at McDonalds.[4] (AR 330). In 2004 through 2005, plaintiff worked for Waynesborough Restaurant Inc. at Pretzel Bakery. (AR 338, 371). He then moved to AC Moore Incorporated in 2006, working as a busboy at a country club. (AR 338, 371, 606). In 2008, plaintiff was employed by Nolan-Heil Holdings, LLC. (AR 338). In early 2014, plaintiff worked at PetSmart Inc. before moving to Alexandria, Virginia, where he took up a position with Hog Thaid LLC working at Pork Barrel BBQ. (*Id.*). For the second and third quarter of 2015, plaintiff worked for Austin Grill LLC before moving to Pizzaiolo Café Group LLC for the last quarter. (AR 338, 339). He then briefly worked for John McBrian, Inc. at the beginning of 2016. (AR 53, 352). Plaintiff's last known employment was in 2017 when he worked for MFG Kingstowne LLC as a sandwich maker at Firehouse Subs. (AR 52, 352).

### B.     Summary of Plaintiff's Medical History Prior to Alleged Date of Disability[5]

Throughout the Administrative Record, plaintiff's early years are detailed at length as important historical information pertaining to his medical, psychological, and psychiatric

---

[4] The detailed earnings query does not show any earnings for plaintiff for 2001 through 2003, 2007, and 2009 through 2013. (AR 330–31).

[5] The AR contains over 700 pages of medical records from various sources relating to plaintiff's medical, psychological, and substance abuse treatments. This summary provides an overview of plaintiff's treatments and conditions relevant to his claims and is not intended to be an exhaustive list of every treatment.

treatment. For the sake of completeness, a brief overview is included here. Plaintiff's birth mother was reported to have been a heroin addict who continued to abuse drugs while she was pregnant with plaintiff. (AR 461). He was born six weeks prematurely and had a birth weight of just three pounds. (*Id*.). He was also noted to have a cardiac murmur. (AR 461–62). Plaintiff's biological father was frequently incarcerated. (AR 524). Three weeks after his birth, plaintiff was adopted. (AR 461). As an infant, he was often sick: at the age of six months, he was hospitalized for gastroenteritis. (AR 462). He also experienced numerous ear infections and bronchial problems. (*Id*.). Plaintiff has a history of asthma and slow growth, for which he received hormone treatment. (*Id*.). In 2000, plaintiff became drug involved and stole a considerable sum of money from his adoptive parents. (AR 461). Although he was an excellent gymnast, had a job, and was an active member of his youth group, plaintiff withdrew from all these activities in 2000 and, around the same time, stopped taking his ADHD medication. (*Id*.).

The Administrative Record contains only one medical record prepared prior to plaintiff's alleged disability date of July 1, 2006. (AR 460–66). In 2001 plaintiff was referred to Springfield Psychological for an updated evaluation to help determine his learning needs and educational placement following his parents' request that he be placed at an Approved Private School. (AR 460). A Comprehensive Evaluation Report ("CER") dated June 16, 2001 provides a detailed overview of plaintiff's educational, social, and physical history. (AR 460–62). Plaintiff was identified as a "youngster with learning needs" and received special education services while at school in the Lower Merion School District. (AR 460). Beginning in seventh grade, plaintiff attended Chalutzim Academy, but in April 2000 he was expelled as a result of "noncompliant behaviors." (*Id*.). He was home-schooled for the remainder of the school year before starting the eleventh grade at Marple-Newtown High School in September 2000. (*Id*.). In

6

the mornings, plaintiff attended an emotional support class where he received his academic

subjects; in the afternoon, he attended a vocational technical program for the culinary arts. (*Id.*).

However, as a result of truancy, plaintiff was removed from the culinary arts program and

returned to Marple-Newtown full time. (*Id.*). In November 2000, plaintiff entered a partial

hospitalization program for thirty days at Mirmont before returning to school. (AR 460–61). In

February 2001, plaintiff returned to Mirmont as an inpatient for thirty days, followed by six more

weeks in a partial hospitalization program. (AR 461). Toward the end of his time at Mirmont,

he was asked to leave for rule-breaking. (*Id.*). At the time of the CER, plaintiff had returned to

Marple-Newtown and had two weeks of regular attendance before becoming truant again. (*Id.*).

Plaintiff's CER also noted that he had been evaluated numerous times which, in April

1990, resulted in a diagnosis of Attention Deficit Disorder ("ADHD") with Hyperkinesis. (*Id.*).

He had undergone a series of intelligence tests, the most recent of which showed he had a low

average range for cognitive functioning, spelling skills at an eighth-grade level, and reading and

math skills at a fourth-grade level. (*Id.*). During the evaluation, plaintiff undertook a Wechsler

Individual Achievement Test which showed that he continued to experience significant delays in

his math, writing, reading, and listening abilities. (AR 462–63). Plaintiff's parents were asked

to respond to questions concerning plaintiff's behavior and indicated numerous areas that were

of significant concern. (AR 464). Plaintiff's father detailed how plaintiff had been in trouble

with the police, threatened to hurt others, played with fires, and used illegal drugs. (*Id.*).

Plaintiff's mother indicated that plaintiff lied, was out of touch with reality, not interested in the

ideas of others, expressed suicidal ideations, and had tried to hurt himself. (*Id.*). Also

responding to questions about his behavior, plaintiff himself indicated that he believed he could

not control his thoughts or what happens to him. (*Id.*). He expressed paranoid ideations, did not

see the value of school, and viewed himself as not being able to meet with academic success. (*Id.*). Plaintiff also underwent a Thematic Apperception Test, a Sentence Completion Test, and a test for the Roberts' Adolescent Depression Scale, the results of which indicated that plaintiff felt badly about getting into trouble but was unable to understand how his behaviors led to that result. (*Id.*). Additionally, the stories plaintiff told in response to pictures included themes of fear and danger, abandonment, and not fitting in. (*Id.*). The CER found plaintiff required a highly structured behavioral and emotional support program that utilized a system of rewards and consequences. (AR 465). He was found to be at "great risk" for illegal behaviors that could result in incarceration given his defiance of rules at home, at school, in a clinical setting, and in society. (*Id.*). It was recommended that he continue with the support of special education services but that a more restricted and structured setting could be needed if his truancy, illegal behaviors, and noncompliant behavior persisted. (*Id.*).

### C.     Summary of Plaintiff's Medical History Following His Alleged Disability Date (July 1, 2006)

Plaintiff self-referred to the Northwestern Human Services of Delaware County, Pennsylvania ("NHS clinic") on February 19, 2009 for a bio-psycho-social assessment. (AR 476–84). He reported trouble sleeping and periods of extreme irritability, the latter of which had resulted in property damage although plaintiff was not aware of this while it was happening. (AR 476). Plaintiff also reported how alcohol exacerbated his anger, that he had anxiety about relationships, and anxiety about death, particularly violent deaths. (*Id.*). He exhibited some OCD symptoms, such as "tearing up" the house when he was unable to find something. (*Id.*). Plaintiff shared that he had a healthy diet, walked daily, and that spirituality was important to him. (*Id.*). He discussed his alcohol addiction and how he thought it was related to his anxiety, although he was unsure what his relapse triggers were. (AR 478). Plaintiff's mental status exam

did not show anything of significant concern and he was found to be committed to treatment, actively seeking help, and focused on getting his GED. (AR 481–83). Plaintiff maintained contact with the NHS clinic, meeting a therapist once a month from February 23, 2009 to June 26, 2009, and completing a series of treatment plans. (AR 467, 472–75).

On April 28, 2009, plaintiff underwent a psychiatric evaluation at the NHS clinic with D.S. Mahajan, M.D. (AR 468–71). Plaintiff self-referred for the examination and reported anxiety, poor sleep, and mood swings since childhood. (AR 468). At the time, he was living with his parents in Pennsylvania. (*Id.*). Plaintiff described feeling depressed, tired in the mornings, and on the verge of crying. (*Id.*). He had suicidal ideations at times and explained how he had attempted suicide two years previously. (*Id.*). Plaintiff also reported a fear of crowds. (*Id.*). He explained that he had been mugged around the age of ten/eleven and felt that his life had been in danger. (*Id.*). He still experienced flashbacks of the incident and this is what had caused his fear of people in general. (*Id.*). At the age of four/five, plaintiff was diagnosed with ADHD and put on Adderall, which did not help. (AR 469). His mother took him to the NHS clinic when plaintiff was fifteen/sixteen, and he was prescribed Depakote for a year alongside other medications, including Seroquel. (*Id.*). Again, plaintiff reported the medications had not helped. (*Id.*). Plaintiff had a history of alcohol and substance abuse: he detailed that he used to drink liquor and smoke marijuana all day and that he had also tried Xanax and Ecstasy. (*Id.*). Plaintiff stated that he last used alcohol a month before and last smoked marijuana four months ago. (*Id.*). Dr. Mahajan found plaintiff clean and cooperative with normal motor behavior, no fidgetiness, tics, or involuntary movements. (*Id.*). Plaintiff's speech was normal in tone and volume, his mood okay, and his affect stable. (AR 470). He exhibited no auditory or visual hallucinations and both his short-term and long-term memory were fair. (*Id.*). Plaintiff's

judgment and insight were described as "partial" given that he did not accept drugs were a problem for him. (*Id.*). Although his thought processes were logical, he did have paranoid ideations. (*Id.*). Dr. Mahajan diagnosed plaintiff with mood disorder not otherwise specified, posttraumatic stress disorder, R/O panic disorder with agoraphobia, alcohol dependence, marijuana abuse, and a history of ADHD. (*Id.*). His Global Assessment of Functioning ("GAF") score was 60. (*Id.*). Dr. Mahajan's recommended treatment plan included psychotherapy on a regular basis and one month's supply of Seroquel and BuSpar, with one refill. (AR 471). Plaintiff was told that Xanax and benzodiazepines would not be used initially in treatment until the NHS clinic got to know him better and he was in regular therapy. (*Id.*).

Plaintiff reported to Dr. Mahajan on June 19, 2009 and was found to have made "limited progress." (AR 487). Dr. Mahajan noted plaintiff was "not well" and was struggling to sleep because he wanted to use drugs. (*Id.*). Plaintiff was to continue to take Seroquel and Vistant but was taken off of BuSpar because it was causing plaintiff problems. (*Id.*). At plaintiff's next appointment on August 7, 2009, he reported poor sleep resulting in feeling tired every day and increased migraines. (AR 486). At night he was shaky and sweaty. (*Id.*). Dr. Mahajan again found plaintiff's progress limited. (*Id.*).

Three years later, on June 14, 2012 and pursuant to a 302 commitment, plaintiff was taken by the police to Mercy Fitzgerald Hospital and admitted there after attempting suicide. (AR 489–95). Plaintiff was upset over family issues and financial stresses and admitted to drinking alcohol and smoking marijuana, although denied ingestion of any substances. (AR 490). A physical examination was performed and generally, all results were normal. (*Id.*). Courtney Bethel, M.D., diagnosed plaintiff with suicidal ideation and alcohol intoxication, and he was discharged to a psychiatrist. (AR 492–93).

Plaintiff was admitted to the Adult Inpatient Dual Diagnosis treatment program at Horsham Clinic from November 16, 2012 to December 5, 2012 to address his suicidal ideations and alcohol abuse. (AR 502–04). Previously, plaintiff had spent two weeks at "The Ministry," a Christian-based rehab program, but was not accepted back to the program after he was sent to the emergency room for self-harm. (AR 502–03). Plaintiff had been self-harming due to loneliness, anxiety, and suicidal thoughts and had also been abusing alcohol daily. (*Id.*). He was referred to the emergency room for a level-of-care assessment where he was then referred to Horsham Clinic. (*Id.*). Andrew Simonson, M.D., the attending psychiatrist, performed a physical examination of plaintiff which showed no acute or chronic medical problems, and a mental examination which found plaintiff clean, well-nourished, and cooperative. (*Id.*). Dr. Simonson found plaintiff's mood depressed, his affect blunted, and although he had no homicidal ideations, he had auditory and visual hallucinations as well as suicidal ideations. (AR 502). The treatment program at Horsham Clinic engaged in several types of treatments with plaintiff to include individual, group, and milieu programs. (AR 503). Plaintiff was placed on self-injurious precautions and began on Zoloft, Seroquel, and Trazodone. (*Id.*). A Serax taper was started for his alcohol withdrawal. (*Id.*). During treatment, plaintiff reported visual hallucinations to include outlines of objects, huge spots, and sometimes ghosts. (*Id.*). He also had auditory hallucinations telling him that it was fine to hurt himself. (*Id.*). Plaintiff reported that he had attempted suicide over 125 times. (*Id.*). He also admitted that "The Ministry" felt it could not help plaintiff, not just because of his self-harm but also because he had been caught fermenting bread. (*Id.*). Plaintiff's father was contacted, which plaintiff related helped him feel more supported. (*Id.*). As the treatment program progressed, plaintiff's affect brightened, he became more visible on the unit, and engaged more both socially and in the programming. (*Id.*). His

discharge, however, was postponed when he reported that he was suicidal. (*Id.*). Eventually, plaintiff felt safe enough to be discharged to rehab treatment and reported no suicidal or homicidal ideations or auditory or visual hallucinations. (*Id.*). At discharge, plaintiff's prognosis was described as "fair" and his medications included Zoloft, Seroquel, Naltrexone, Sinequan, folate, thiamine, and a multivitamin. (AR 503–04). Plaintiff was to immediately follow up with care at Riverbend in Philadelphia. (AR 503).

From January 11, 2013 to February 8, 2013, plaintiff was treated at Eagleville Hospital. (AR 509–15). He was admitted to the Non-Hospital Level Co-Occurring clinic and attended group therapy, individual therapy, and psychoeducational groups. (AR 510). At the beginning of his stay, plaintiff was psychiatrically evaluated. (AR 512–15). He reported to Kambeze Etemad, M.D., that he was depressed and irritable with some "racing activation." (AR 512). He denied any current suicidal or homicidal ideations or auditory or visual hallucinations. (*Id.*). Dr. Etemad found plaintiff's appearance and grooming normal, and that he had a good rapport, normal speech, and logical and goal-oriented thought processes. (AR 513). However, his mood was irritable and dysphoric and his affect anxious. (*Id.*). Plaintiff's insight into his addiction was noted as "fair." (AR 514). As a result of the evaluation, plaintiff was started on Lithium and taken off BuSpar. (*Id.*). While at Eagleville Hospital, plaintiff made some progress toward his treatment goals. (AR 510). Upon admission, his GAF score was noted as between 31–41, which increased to 48 upon discharge. (AR 510–11). At discharge, plaintiff was medically and psychiatrically stable. (AR 511). His prognosis was evaluated as "guarded" and his progress limited, and it was noted that any continued progress would be "entirely contingent" on support, encouragement, and confrontation by his peers and staff. (*Id.*). Plaintiff required "structure, and intensive, continuing formal treatment." (*Id.*).

Based on a referral by Eagleville Hospital, on February 25, 2013, plaintiff underwent a routine bio-psychosocial evaluation with Pat McGarvey at SouthWest Nu-Stop Recovery. (AR 519–33). Plaintiff reported that three months previously he had attempted suicide, at which point he checked himself into therapy at Horsham Clinic. (AR 519). Since the attempt, he had been experiencing suicidal ideations, but his goal was to have "a career and to get [his] life together." (*Id.*). When asked about how alcohol and drug use had affected his life, plaintiff reported that he had lost all of his family except for his father and felt that in regard to his physical health and well-being, it was harder to breath and his brain was "slower than what it was." (AR 521). Plaintiff also described how he had not been "enthused to go back and try" when asked about employment and educational opportunities, and that he thought his drug use had not affected his interpersonal relationships with others. (*Id.*). Plaintiff denied any history of suicidality, attempts, homicidal ideations, assaultive behaviors, fire setting behaviors, or cruelty to animals, but explained that he had attempted suicide when under the influence of drugs and alcohol thus was not certain of the circumstances that led to these attempts. (*Id.*). Mr. McGarvey asked plaintiff what he did when he was "in crisis" to which plaintiff explained that he isolated himself and did not contact anyone. (*Id.*). Despite medication, plaintiff expressed that he still felt anxious and had nightmares but that he enjoyed those nightmares. (AR 522). He noted that his relationship with his father was excellent, as was his relationship with his cousin Jesse because they "ha[d] always been there for each other no matter what the occasion was." (AR 524–25). Plaintiff's relationship with his mother was conflicted because she wanted him to be independent and did not allow him to live with her. (*Id.*). Because of this, plaintiff was residing in a recovery home. (AR 531). Plaintiff explained that his current source of income was in jeopardy as his

inheritance was running low. (AR 528). He denied any employment since the age of seventeen. (AR 531).

Mr. McGarvey noted that plaintiff's preferred defense mechanism was that of displacement, likely a result of not having a connection to his mother and therefore "lacking the nurturing behaviors associated with this role member." (*Id.*). Consequently, plaintiff had rechanneled those abandoned feelings and sought refuge in drugs and alcohol. (*Id.*). Mr. McGarvey also found plaintiff did not associate with anyone who did not use substances and lacked insight into his co-occurring disorders. (*Id.*). Moreover, plaintiff did not yet have stability on his psychotropic medications. (AR 532). Mr. McGarvey did find plaintiff internally motivated for treatment and that he wanted to gain a deeper understanding of both himself and his substance use. (*Id.*). Plaintiff reported that he felt determined, had a good personality, was honest, took pride in his appearance, and was dedicated when he put his mind to something. (*Id.*). His goals at the end of his evaluation were to sustain sobriety and take a urinalysis once a week, to develop sober supports within his community, and to obtain a GED. (AR 533). Based on this evaluation, plaintiff was scheduled to see a staff psychiatrist (AR 532) but he failed to follow through with that appointment (AR 535).

In the evening of June 21, 2013, plaintiff arrived at the emergency department of Jefferson University Hospital. (AR 536). He was intoxicated, complained of chest pains, and stated that he needed help because he was suicidal. (AR 536–37, 539). Plaintiff was well-nourished, alert, oriented to person, place, and time with no acute distress nor obvious discomfort. (AR 537). He reported that he did not have chest pains when he was drinking and asked for information on rehabilitation for his alcohol dependence. (*Id.*). A chest x-ray showed plaintiff's heart and mediastinum were normal and he had no infiltrates or effusions. (AR 550).

His blood alcohol level was 236 mg/dL, but a drug abuse panel of tests came back negative. (AR 577, 581–82). Plaintiff explained that he had experienced suicidal thoughts before and "always ha[d] a plan" for how to do it. (AR 539). Plaintiff denied homicidal ideations and hallucinations but admitted to multiple drug use and drinking. (*Id.*). He also denied physical complaints, but when prompted about the chest pain he mentioned in triage, plaintiff reported that he had experienced sharp pains for two months and felt as though his "heart [was] beating hard." (*Id.*). A physical examination was performed, the results of which were largely normal. (AR 540). Plaintiff was diagnosed with depression, suicidal ideations, and polysubstance abuse. (*Id.*). It was noted that the cause of his chest pains was unlikely to be cardiac-related. (*Id.*). Plaintiff was assessed as requiring psychiatric evaluation and it was recommended that he be admitted to a facility designated by the County Administrator for a period of time not to exceed 120 hours. (AR 548). He was transferred by ambulance to the Chemical Dependency Program at Fairmont Behavioral Health on June 22, 2013. (AR 539).

From June 22, 2013 to July 26, 2013, plaintiff attended the Chemical Dependency Program at Fairmount Behavioral Health. (AR 590). Upon admission, plaintiff's GAF score was noted as 40. (*Id.*). Pamela Ralph, M.D., completed plaintiff's admission documentation, noting that he abused alcohol, cannabis, and phencyclidine, but was motivated to attend treatment because he was scared for his life. (AR 595–96). He had fair hygiene, good eye contact, and normal prosody, but his mood was dysphoric, and his affect constricted. (AR 595). Plaintiff did not have suicidal or homicidal ideations nor perceptual disturbances. (AR 596). He was goal-directed with clear sensorium, and oriented to person, place, and time, with fair judgment/insight. (*Id.*). Dr. Ralph found plaintiff's "need [for] treatment for acute intoxication or withdrawal" and his "high relapse potential due to inability to control substance use despite

15

active participation in less restrictive areas" justified twenty-four-hour care. (*Id.*). Upon discharge, plaintiff's GAF score remained at 40, but he was found to have completed all the objectives of his treatment plan; namely, working on "Step One" which concerned addiction, the brain, and self-forgiveness. (AR 590–91). His prognosis was described as "fair" and he was to continue working on relapse prevention. (AR 591).

From July 29, 2013 to November 13, 2013, plaintiff was treated at Self Help Movement, Inc. (AR 962). While there, plaintiff worked on the first three steps of the 12 Step Model of Recovery and Cognitive Behavioral Therapy. (*Id.*). He relapsed during treatment but returned to the process "remorseful" and "more determined than ever to turn his life around." (*Id.*). At discharge, plaintiff was taking Trazodone and Seroquel. (*Id.*). It was noted that plaintiff had experienced a lot of self-inflicting trauma and would benefit from continued addressment of this to help with his recovery. (*Id.*). Further, he would need to maintain the coping strategies he had developed during treatment to help with his anger issues. (AR 964). Plaintiff was discharged into the Self Help Movement Transitional Living facility and demonstrated strong motivation to continue attending Alcoholics Anonymous ("AA") and Narcotics Anonymous ("NA") meetings. (*Id.*). He was to utilize Philadelphia Flight to assist in furthering his education, specifically to achieve his GED. (*Id.*). His prognosis/relapse potential was noted as fair. (AR 963).

Plaintiff saw Joseph Foote, M.D., for a disability evaluation on December 23, 2013. (AR 603–08). He was thirty minutes late for his appointment and Dr. Foote noted he appeared anxious. (AR 603). Plaintiff's appearance and dress were consistent with his age, the weather, and the occasion, although Dr. Foote observed that plaintiff "looked significantly older than his stated age." (*Id.*). In discussing plaintiff's prior medical and treatment history, plaintiff explained that he had not been employed in over three years because of his "multiple health

16

problems" affecting his ability to work; namely, he became anxious, forgetful, scared of the people around him, had difficulty focusing and following directions, and felt people were out to get him or were watching him. (AR 604). At the time of the interview, plaintiff stated that he was depressed four to five days a week, and that on those days, he was sad and unmotivated, felt close to tears, and had poor appetite and poor sleep. (*Id.*). Although he had experienced suicidal thoughts in the past and self-harmed, at this time, plaintiff did not think he was going to harm himself and was not at immediate risk. (*Id.*). Plaintiff completed the Beck Depression Inventory and received a score of 40, indicating a severe range of depression. (*Id.*). Plaintiff reported that he had not used drugs on a regular basis for the past six months nor had he consumed alcohol in the past month. (AR 605). He was currently in the WEDGE alcohol program. (*Id.*). Dr. Foote noted that plaintiff had difficulty in maintaining eye contact, constantly shifting his leg during the interview, and appearing agitated. (AR 606). His affect was restricted, but his speech was coherent and goal-oriented and, overall, plaintiff was cooperative and established a satisfactory rapport with Dr. Foote. (*Id.*). Plaintiff was a poor historian and had difficulty focusing, struggling to count backwards by seven. (AR 607). He was able to handle funds, but Dr. Foote noted that given his judgment, it would be better if someone else managed plaintiff's finances instead. (AR 608). Plaintiff stated that he could independently cook and do his laundry but did not like to go out shopping because of his anxiety. (*Id.*). He also explained that he was incapable of maintaining his hygiene independently because of his depression. (*Id.*). As to his attention, concentration, and pace, it was noted that plaintiff reported he had a difficult time focusing, he was diagnosed with ADHD as a child, he needed help with scheduling doctor appointments and monitoring medication, and he was anxious. (*Id.*). Dr. Foote found plaintiff's prognosis "extremely poor." (AR 607).

On January 21, 2014, plaintiff voluntary sought inpatient detox and rehabilitation for benzodiazepine addiction at the Crisis Response Center (Behavioral Health) of Temple University Hospital. (AR 730, 737). Plaintiff was taking between ten and fifteen benzodiazepine pills a day. (AR 730). He also reported taking between ten to fifteen "bars" of Xanax and three to four tablets of Suboxone daily. (AR 737). He had relapsed because one of his friends had died, he "just didn't care anymore," and staying in a recovery house was akin to staying in a "crack house" as everyone was using drugs. (AR 730, 737). Plaintiff was disheveled, with slow motor behavior, slow speech, and flat affect. (AR 733). He was placed on observation every thirty minutes and monitored for any shifts in his vital signs subsequent to his withdrawal from benzodiazepine. (AR 735, 743). Plaintiff was to be educated about his medications, community resources, and crisis planning. (AR 735). His motivation to achieve sobriety was to "get his life back on track and stop putting his life in danger." (AR 738). Plaintiff was discharged by ambulance early the next morning. (AR 746–47).

Plaintiff returned to the Crisis Response Center at Temple University Hospital on February 18, 2014, self-referring for detox from heroin and benzodiazepine. (AR 703). He reported taking one "bundle" of heroin and between ten to fifteen pills of benzodiazepine daily. (*Id.*). His motivation for treatment was to "live a clean and decent life." (*Id.*). Plaintiff stated he was living in Fresh Start recovery house. (AR 705). Plaintiff was disheveled in appearance but had normal speech, mood, and motor behavior. (AR 706). He admitted to attempting suicide twice. (*Id.*). Plaintiff was placed on observation at thirty-minute intervals. (AR 708). Shraddha Jani, M.D., evaluated plaintiff and noted that it appeared his primary concern was to obtain a cigarette as he mentioned this several times during their interview. (AR 710). She found both plaintiff's motivation for getting clean and his failure to explain why he had relapsed so quickly

and not complied with outpatient treatment "vague." (*Id.*). Dr. Jani detailed that plaintiff had recently stayed at St. Joseph's for detox following his previous discharge from the Crisis Response Center, leaving after seven days, and going to Fresh Start recovery house. (*Id.*). He was to follow up at the Northeast Treatment Center but denied that he had started taking Methadone there, citing to paperwork that he had not completed. (*Id.*). Plaintiff admitted to Dr. Jani that he relapsed seven days after his discharge from St. Joseph's and, although he had been referred to Broad Street by his recovery house, he ended up walking to the Crisis Response Center instead. (*Id.*). He could not explain his reasons for doing so. (*Id.*). Plaintiff did not meet the criteria for inpatient admission, so was discharged back to Fresh Start recovery house later the same day, February 18, 2014. (AR 717, 721). At approximately 11:30 p.m. that evening, plaintiff returned to the Crisis Response Center under 201 with superficial lacerations on his thigh. (AR 725). He stated that he was there for "self-mutilation." (*Id.*). Dr. Jani, the attending psychiatrist, described plaintiff as manipulative and unhappy because of his living situation. (*Id.*). She also noted that he had not made any effort at his intensive outpatient program since his discharge from St. Joseph's in late January. (*Id.*). Plaintiff was disheveled, but with fluent and spontaneous speech, linear thought processes, clear sensorium, no suicidal or homicidal ideations, and no auditory or visual hallucinations. (*Id.*). His mood was euthymic. (*Id.*). He was again discharged to Fresh Start and referred to Covenant House and/or Northeast Treatment Center. (AR 726–27).[6]

The following day, plaintiff was admitted under a 201 to Hahnemann University Hospital after walking into the emergency room with complaints of suicidal ideations. (AR 616, 629).

---

[6] The AR contains a single "Report of Contact" dated February 18, 2014 from Thomas Fink, Ph.D., that "there is no evidence of any immediate suicidal or homicidal risk." (AR 611).

He had a superficial cut on his inner left thigh from a razor blade. (AR 616). Plaintiff was depressed and anxious, had suicidal ideations, and was upset at being put out of the recovery house where he was staying for a positive urine screen, although plaintiff initially reported that he was put out for self-harming. (AR 616, 623). Plaintiff admitted to relapsing on both heroin and Xanax and had taken Klonopin too. (AR 622–23). He reported family stressors, which included losing his partner four to five years ago. (AR 616). Plaintiff was receiving food stamps due to unemployment. (*Id.*). He reported poor sleep, anhedonia, helplessness, hopelessness, and social isolation, explaining that he had stopped seeing his psychiatrist and stopped taking his medication. (AR 622). Donald J. Kushon, M.D., found plaintiff disheveled, mildly agitated, with a labile and irritable mood during admission. (AR 616). Plaintiff's thought processes were goal directed, but his thought content was positive for suicidal ideations, although he had no specific plans. (AR 616, 620). He was able to contract for safety and his cognition was grossly intact, but his insight was poor. (AR 616). He denied auditory or visual hallucinations or paranoid ideations. (*Id.*). Plaintiff was started on Methadone, Ativan, Seroquel, and comfort medications Bentyl, Motrin, and Tigan, all of which he tolerated well. (*Id.*). The cut on his thigh was monitored and plaintiff received bacitracin three times daily as required. (AR 616–17). The following day, on February 20, 2014, plaintiff was assessed by the psychiatric team who found his mood symptoms improved and that he was no longer suicidal. (AR 617). Subsequent to a request by plaintiff for inpatient detox and rehabilitation, he was transferred to the Kirkbride Center for an intake assessment. (*Id.*).

Plaintiff stayed at the Kirkbride Center from February 20, 2014 through March 1, 2014 and was attended to by Fred Bauer, M.D. (AR 649). At admission, plaintiff's general appearance was described as disheveled, but he was alert and oriented to person, place, and time.

(AR 653). His thought process was linear, his insight and judgment fair, and his memory intact. (*Id.*). His mood was dysphoric and his affect labile. (*Id.*). Plaintiff's initial plan of care included medication management, group and individual supportive therapy, addictions counseling, and discharge planning. (*Id.*). While at the center, plaintiff underwent a psychosocial evaluation. (AR 654–65). In that evaluation, plaintiff explained that he sought help to stop using drugs and to "get a better life." (AR 654). He described his relationships with his family, his education, and his faith. (AR 655–56, 659). Of particular note, plaintiff detailed that he was now homeless in an unsafe neighborhood and that he did not know where he would reside after his discharge from the Center. (AR 656, 660). Plaintiff explained that his friends and older brother first introduced him to drugs and that his abuse caused problems at school, such that he did not attend class or that he ended up in detention. (AR 661). He indicated that his alcohol and drug abuse also caused him to fight at school and throw chairs leading to suspension and expulsion. (*Id.*). Plaintiff explained that he thought of alcoholism and drug dependency as a "disease" rather than a "bad habit" and that his triggers included pain and friends. (AR 662). Plaintiff was found to be intelligent with an ability to listen to others and engage in the process but struggled with regulating his emotions and anxiety and had not yet developed positive coping skills, a positive support system, or self-care. (AR 665). Detoxing from opiates was a necessary first step for plaintiff, following which his aftercare would be assessed. (*Id.*). Plaintiff's discharge records indicate that plaintiff completed opiate withdrawal and was calm and cooperative. (AR 650). He was to continue recovery and treatment, attend NA groups five times a week, develop a support system, and attend consistent weekly therapy sessions. (*Id.*). He was discharged to a recovery house. (AR 649).

At 8:45 p.m. on March 20, 2014, plaintiff returned to the Temple University Crisis Response Center after being referred there by St. Joseph's. (AR 683). Plaintiff reported that he was "very depressed due to circumstances in [his] life" and described three ways in which he had considered committing suicide. (*Id.*). He had low concentration and low sleep and stated that "he wouldn't make it" if he was discharged. (AR 690, 701). He was found to have barbiturates in his system which plaintiff was "befuddled" by given that he had not used any drugs for the past two to three weeks and barbiturates were not his drug of choice. (AR 683). Plaintiff detailed that to maintain sobriety, he was in treatment, avoided people, places, and things, and obtained a sponsor. (*Id.*). His motivation for treatment was to "have a better life" and he felt "ready to work the program." (*Id.*). He wanted to deal with his mental health issues and get his life back on track. (*Id.*). Plaintiff shared that he was experiencing current suicidal ideations, precipitant on feeling that there was nothing worth living for and that he had no friends and no family. (AR 686). He was well-nourished, cooperative, and maintained good-eye contact. (AR 693). He had no spontaneity in his speech, although his thought processes were coherent and goal directed. (*Id.*). Plaintiff's mood was depressed, and his affect constricted. (*Id.*). Seetha Chandrasekhara, M.D., who conducted plaintiff's interdisciplinary psychiatric assessment, recommended plaintiff be placed on twenty-three-hour observation to monitor him further. (AR 691). When he was informed of this, plaintiff requested discharge. (AR 675, 681). He denied having suicidal ideations, but later insisted he was suicidal again. (AR 675). The attending physician noted plaintiff was using his suicidal ideations to manipulate staff as he did not want to be in a "twenty-three-hour bed." (*Id.*). He was, however, eating, sleeping, watching television, and talking to peers. (*Id.*). He had no visual or auditory hallucinations nor homicidal ideations. (*Id.*). Plaintiff soon requested to be discharged again, just a few hours into his twenty-three-hour

admission. (*Id.*). At approximately 10:00 a.m., plaintiff was discharged and referred to Northeast Treatment Center. (AR 679–80).[7]

On April 3, 2014, plaintiff was admitted to the Clinical Center at the National Institutes of Health for treatment and research studies involving alcoholism. (AR 751). In his initial examination, plaintiff detailed his alcohol and drug abuse to Nancy DiazGranados, M.D., explaining that he currently drank until he blacked out. (*Id.*). At the time of the appointment, his last drug use was approximately two months previously. (*Id.*). Dr. DiazGranados noted that plaintiff had been diagnosed with ADHD at the age of seven and took medication until he was sixteen. (AR 753). On admission, plaintiff's diagnoses including alcoholism, cannabis abuse, opiate abuse, hallucinogen abuse, tobacco dependence, R/O substance induced mood disorder, ADHD by history, and R/O substance induced insomnia. (AR 754). Plaintiff saw Dr. DiazGranados for a second time on April 8, 2014. (AR 755). He was alert and oriented to person, place, and time, with no acute distress, and he was dressed and groomed, maintained good eye contact, and spoke articulately and spontaneously, with some repetition. (*Id.*). His mood was described as anxious. (*Id.*). Plaintiff sought a change in his medication, requesting phenobarbital for his detox and an increased frequency of Clonidine and Diazepam. (AR 756). He also requested Percocet for migraines, even though he had been educated that that this behavior would risk relapse or delay recovery. (*Id.*). Plaintiff had also been educated about the need for proper treatment of his anxiety and pain and that this did not include Diazepam or Percocet. (*Id.*). Dr. DiazGranados noted that plaintiff had "poor boundaries," was still hesitant

---

[7] The AR does not contain any treatment notes from Northeast Treatment Center following this discharge.

regarding sober living, and with some potential developmental delay at the age he began to use drugs. (*Id.*). Plaintiff was to continue detox, milieu, and group therapy. (AR 757).

On April 10, 2014, plaintiff reported to Dr. DiazGranados that he was feeling better, but he needed Motrin because his entire body hurt. (AR 758). His mood was noted as "neutral" and "improved" with a broad range of affect appropriate to the situation and congruent with his thought process. (AR 758–59). Dr. DiazGranados noted that plaintiff was less seeking medication and more wanting to talk about his long-term needs for treatment and functional recovery. (AR 759). Plaintiff was to continue milieu and group therapy, moving to level 3. (AR 760). On the same day, plaintiff underwent the first of four acupuncture treatments to manage the symptoms of his headaches and anxiety. (AR 793). Before the acupuncture, plaintiff was experiencing headaches with symptoms rated at 6.5 out of 10; after treatment, plaintiff reported his symptoms as 3.5 out of 10. (*Id.*). He also felt less anxious and more relaxed. (*Id.*).

Twelve days into his stay at the Clinical Center, on April 14, 2014, plaintiff reported to Dr. DiazGranados that he was feeling much better but that his anxiety was bad when he felt bored. (AR 761). He was to continue at level 3 with milieu and group therapy. (AR 762). Plaintiff completed a Structured Clinical Interview for DSM Disorders and was diagnosed with psychosis not otherwise specified, bipolar II, panic disorder with agoraphobia, social phobia, and specific phobia. (AR 763). A note indicated that there was some thought that plaintiff's diagnoses could be substance induced but that, nonetheless, treatment options were discussed. (*Id.*). Plaintiff underwent his second acupuncture therapy on the same day, reporting anxiety and headaches rated at 8 out of 10. (AR 791). After treatment, plaintiff's headaches were at 3 out of 10 and his anxiety was reduced. (*Id.*).

Plaintiff received his third acupuncture therapy on April 16, 2014. (AR 789). Before treatment, he was experiencing headaches with symptoms at 9 out of 10 as well as feelings of anxiety. (*Id.*). After acupuncture, plaintiff's headaches were at 6 out of 10 and he was feeling less anxious. (*Id.*). On April 17, 2014, plaintiff reported to Dr. DiazGranados that he felt he could get sober but also asked for either an Ambien or a Xanax. (AR 764). Plaintiff was to continue at level 3 with milieu and group therapy. (AR 765). Five days later, plaintiff complained of a sore throat and an upset stomach. (AR 767). He had a low-grade temperature and was placed on respiratory isolation pending the results of his nasopharyngeal wash and throat culture. (*Id.*). Plaintiff underwent his final acupuncture therapy on April 21, 2014. (AR 784). Before treatment, plaintiff reported that his headache symptoms were at an 8 out of 10; after treatment, they were at 4 out of 10. (*Id.*). Plaintiff also reported feeling less anxious. (*Id.*).

Twenty-three days into his stay at the Clinical Center, on April 25, 2014, plaintiff reported to Dr. DiazGranados that his cravings were at a 10 out of 10 and he still had both pain and anxiety. (AR 769). He was to continue at level 3 with milieu and group therapy, but was also provided with a nicotine patch, 50 milligrams of Naltrexone, and 300 milligrams of Gabapentin at bedtime, increasing up to 900 milligrams. (AR 772). Dr. DiazGranados also discussed treatment options with plaintiff. (*Id.*).

On April 29, 2014 and May 5, 2014, plaintiff reported his concerns to Dr. DiazGranados about his departure from the Clinical Center and the news that he had to return to Philadelphia. (AR 774, 777). He was left feeling overwhelmed and anxious. (*Id.*). Following these reports, on May 6, 2014, plaintiff was up with a peer in the early hours of the morning and requested something to help him sleep. (AR 780). He was given 50 milligrams of Trazodone. (*Id.*). Plaintiff was to be discharged from the Clinical Center on May 14, 2019, but five days before

this, he reported to Dr. DiazGranados that he would "not be ready to stay clean" by then. (AR 781). His mood was noted as anxious. (*Id.*).

Plaintiff was referred for substance abuse services provided by the Alexandria Community Services Board ("ACSB") by the Men's Home he was staying in on November 18, 2014. (AR 966). At admission, his blood alcohol level was .24. (*Id.*). Plaintiff explained that while staying at the Men's Home for the past seven months he had remained clean but relapsed on alcohol approximately one month prior to his referral. (*Id.*). He also reported recent use of marijuana. (*Id.*). He completed two and a half days in detox before asking to be discharged, insisting he was no longer in need of the services. (*Id.*). He also did not plan to return to the Men's Home but instead planned on living with his girlfriend in Fairfax County. (AR 966–67). Plaintiff did not have any follow-up plans for treatment. (AR 967). His discharge summary noted that plaintiff displayed "minimal insight" and was not willing to consider long-term outpatient treatment. (AR 970).

Plaintiff requested the help of the ACSB on December 30, 2014, self-referring to detox. (AR 971). He reported being homeless for the last two months but wanted to complete Phase 1 of the Inpatient Substance Abuse Treatment program and enter Phase 2 to "try and get some help and start a new life." (*Id.*). Plaintiff stayed in detox until January 11, 2015, successfully completing Phase 1. (AR 971–72). He agreed to be discharged as he had a court date in Delaware County, Philadelphia the following day on January 12, 2015. (*Id.*). Plaintiff reported feeling anxious about returning to Philadelphia and being around possible triggers. (AR 971). It was agreed that discussions about his continuation in the program would occur upon his return. (*Id.*). Plaintiff returned and began Phase 2 of the program after returning from Philadelphia. (AR 993). However, he was administratively discharged less than twenty-four hours later after it

was discovered that he had administered medication to other clients and tested positive for opiates. (*Id.*).

On January 17, 2015, plaintiff was admitted to Mount Vernon Hospital after arriving intoxicated and with suicidal ideations. (AR 814, 820). He attempted to leave the emergency room and was subsequently assessed for admittance under a Temporary Detention Order ("TDO"). (AR 820, 916). Plaintiff tried to cut himself and then attempted to hang himself with a bed sheet. (AR 814, 820). He was interviewed in the corner of a hospital room after he requested privacy from the officer standing watch in the doorway. (AR 926). Plaintiff was described as unkempt and restless, with slurred speech, a depressed mood and labile affect, unfocused thought content and impaired concentration, little insight, and impaired judgment. (AR 929). He reported a long history of depression, alcohol and drug abuse, and self-harm and explained that he came to the hospital to seek voluntary hospitalization for treatment. (AR 926). When asked about his attempt at suicide in the emergency room, plaintiff described how harming himself was comforting and that the afterlife sounded better than this life. (AR 930). Subsequently, plaintiff was admitted to the hospital on a TDO. (AR 820, 933). Plaintiff reported to Radha G. Agepati, M.D., his irritability, depression, agitation, mood lability, and disturbed sleep. (AR 820). His blood alcohol content level was .317 when he first arrived. (AR 821). He also reported anxiety which he rated at about 8 out of 10, although this increased to 10 out of 10 as he began withdrawing from alcohol later in the day. (AR 814–15). Plaintiff told Richard J. Morris, M.D., that he drank about three bottles of liquor a day and, although he had used drugs in the past, he was not currently taking any. (AR 816). A physical examination after his admission showed plaintiff as oriented to person, place, and time, with a clear chest and normal heart rate but a depressed affect and mood. (AR 817). Plaintiff was continued on the alcohol withdrawal

27

treatment plan and prescribed Librium. (AR 821). On the evening of January 17, 2015, plaintiff reported nausea and an "excruciating headache" but also wished to discuss with the nurse his addiction treatment options. (AR 819). He explained that he used alcohol to cope with his depression, that he had moved from Philadelphia to Virginia about a year ago for his job but had lost that job because of his alcohol use, and that he was now living with his aunt who was also supporting him financially. (AR 819–20).

The following day, Dr. Agepati saw plaintiff. (AR 822). Plaintiff was interacting with the nursing staff on the unit and was cooperative in his interview. (*Id.*). His tremors were improving, he was oriented to time, place, and person, his cognition was intact, he had slept well, and had a fair appetite. (*Id.*). His mood was still depressed and anxious, affect depressed and constricted, and vital signs were still on the higher side due to receiving alcohol withdrawal medication. (*Id.*). Plaintiff was continued on lithium, prescribed Vistaril for his anxiety, and encouraged to participate in the milieu and available groups. (*Id.*). Dr. Agepati noted that he would communicate with the case manager regarding a referral of plaintiff to either the Phase 2 detoxification program or rehabilitation, if it was available. (*Id.*). Later in the day, plaintiff reported to a nurse that he felt like a danger to himself and did not feel safe. (AR 823). He was also feeling emotional and helpless and felt he did not have anything to live for. (*Id.*). He was encouraged to stay visible in the milieu which he did for approximately fifteen minutes before returning to his room. (*Id.*). He remained isolative, coming out of his room for vitals and meals only. (*Id.*). His attendance at group therapy was limited. (AR 824).

On January 19, 2015, plaintiff's affect and mood were flat and anxious, although as the day progressed he "brightened up" and became more visible on the unit. (AR 827). He also attended and actively participated in his process group, identifying his history of substance abuse

and self-harm, but noting he was ready for treatment. (*Id.*). Plaintiff explained that he wanted to be a marine biologist but recognized that to do so, he needed dual diagnosis treatment. (*Id.*). He reported anxiety and urges to harm himself but had not acted on them. (*Id.*). Plaintiff showed some progress in identifying the stressors that led to his suicidal ideations and noted that presently his stressors were his homelessness and lack of access to proper medications. (AR 828). He also indicated that he wanted to voluntarily commit himself to the unit after his TDO hearing and hoped to find a treatment program to address his substance abuse and psychiatric illnesses. (*Id.*). Plaintiff was started on Wellbutrin. (AR 826).

On the day of plaintiff's TDO hearing, January 20, 2015, plaintiff reported feeling more anxiety than the previous day and having more self-injurious thoughts. (AR 829). His affect and mood remained depressed, blunted, and flat. (AR 829, 832). Dr. Agepati continued plaintiff on Wellbutrin and added BuSpar for plaintiff's anxiety. (AR 829). He also transferred care of plaintiff to Suresh Sumana, M.D. (*Id.*). Plaintiff attended and actively participated in an art therapy and process group. (AR 831). He was still intermittently having suicidal thoughts which included a specific plan, and he requested Ambien as Trazodone was not helping. (*Id.*). It was noted that plaintiff was perseverant in receiving his Ativan and Librium every couple of hours as he made frequent stops to the nurses' station to ask when it was time to receive his doses. (AR 833).

Following the TDO hearing on January 20, 2015, plaintiff was committed to a hospital (AR 919) but was ordered to be transferred to Northern Virginia Mental Health Institute when a bed became available. (AR 833–35). Prior to his transfer to Northern Virginia Mental Health Institute, plaintiff was continued on Wellbutrin, BuSpar, and Lithium. (AR 833). Plaintiff had reported that he was not sleeping well and wanted to take Ambien to help him with this. (*Id.*).

However, Dr. Suresh informed plaintiff that Ambien was not a good medication for him given his alcohol dependence to which plaintiff then requested Seroquel. (*Id.*). Dr. Suresh started him on 100 milligrams of Seroquel at bedtime. (*Id.*). Plaintiff continued to be focused on his medications, consistently asking the nurses when his next dose was and if he could have other medications instead. (AR 834). He was encouraged to adopt a non-medicinal approach to his anxiety by engaging in activities such as reading, playing games with his peers, and deep breathing. (*Id.*). Plaintiff was discharged to Northern Virginia Mental Health Institute on January 22, 2015. (AR 835). His discharge records note that overall, plaintiff had reported severe depression, had appeared depressed with blunted affect, and remained isolative. (AR 839). His transfer to Northern Virginia Mental Health Institute was for "further stabilization." (*Id.*). Plaintiff's discharge medication list included Wellbutrin, BuSpar, Vistaril, and Seroquel. (AR 840).[8]

Plaintiff was readmitted to the ACSB Inpatient Substance Abuse Treatment program on February 19, 2015 as a part of his discharge plan from Northern Virginia Mental Health Institute. (AR 993). Plaintiff reported that he had been homeless since November 2014. (AR 996). He denied depression and suicidal ideations and requested the opportunity to discuss medication options with a psychiatrist because he felt sedated on his current regimen. (AR 994). Plaintiff also expressed trouble sleeping for longer than three hours per night. (*Id.*). It was noted that plaintiff's recovery support network was limited, so he needed to reconnect with both his sponsor and the self-help community. (*Id.*). Plaintiff was found to be "contemplating change" and showed interest in treatment, but struggled to maintain focus, being easily distracted by

---

[8] The AR does not contain any treatment notes from Northern Virginia Mental Health Institute following this transfer.

others. (AR 999). Additionally, although plaintiff displayed insight into his substance abuse during individual therapy sessions, he was more superficial in a group setting. (*Id.*). He consistently minimized and avoided discussions about his mental health and past suicidal ideations. (*Id.*). In his clinical intake interview on February 24, 2015, plaintiff was alert and responsive, maintaining good eye contact. (AR 1001). His mood was happy, his thought processes logical, and his thought content normal. (AR 1001–02). Plaintiff's judgment was described as poor and his insight little. (AR 1002). He presented a low risk of suicide while an inpatient and complying with his medications, but it was noted that once in the community and if relapse occurred without a support network, his risk increased significantly. (AR 1003). He would benefit from continued long-term substance abuse services as well as psychiatric medications. (AR 1007). Additionally, plaintiff needed shelter housing and further educational and vocational services for employment opportunities and to complete his GED. (*Id.*).

On March 4, 2015, while still in detox, plaintiff underwent a psychiatric evaluation with John Seed, M.D. (AR 1010–14). Plaintiff wanted refills of his medications which included Quetiapine, Trazodone, Naltrexone, and lithium. (AR 1010). He reported feeling stable and in a good mood most of the time; he was not depressed nor experiencing any suicidal or homicidal ideations. (*Id.*). He was sleeping between four to five hours a night, had reasonable energy, good interest, good self-esteem, and a different attitude due to his medications. (*Id.*). He reported that without medications he was hyper and could not sit still, acted without thinking, and struggled to concentrate. (*Id.*). Plaintiff stated that he was committed to working his program but was vague about his depression and mania. (*Id.*). He hoped to stay in a shelter and then get his most recent job back. (*Id.*). Dr. Seed found plaintiff alert, well-nourished, cooperative, pleasant, with good eye contact. (AR 1101). His mood was described as

unremarkable and remorseful. (AR 1012). Plaintiff's thought processes were logical, his thought content normal, and his judgment good. (*Id.*). Dr. Seed recommended plaintiff continue with his medications but with an increased dosage of Trazadone. (AR 1013).

Plaintiff was administratively discharged from the ACSB Inpatient Substance Abuse Treatment program the following day on March 5, 2015. (AR 1016–17). His urine analysis results from the previous evening tested positive for benzodiazepines and, according to staff, he had deviated from his original plan of taking public transport to his medical review in the evening, instead being taken to and from the meeting by other program clients. (AR 1017). When asked about both of these issues, plaintiff minimized and rationalized the events, explaining that he took the reportedly unknown medication because he did not feel well and departed from his original plan to take public transport because it meant he would not have to walk. (*Id.*). It was found that plaintiff displayed "limited insight" into how his actions placed him and others at risk. (*Id.*). Plaintiff did not agree with the decision to administratively discharge him from the program and reported that he planned to return in thirty days. (*Id.*). He also explained how he would leave and immediately return back to abusing illegal substances. (*Id.*). Follow-up and referral plans included a scheduled appointment at Winter Shelter/Carpenter's for March 9, 2015. (AR 1018).

On March 12, 2015, a Medication/Health Change Form indicated a concern about plaintiff since his administrative discharge from the program. (AR 1020). It was noted that plaintiff did not pick up his prescribed medications the previous week which was concerning given plaintiff was recently suicidal and he stabilized when taking his medications. (*Id.*). Plaintiff had also not turned up for a scheduled appointment on March 9, 2015. (*Id.*). Four days later, Dr. Seed completed a Medication/Health Change Form explaining that plaintiff was briefly

in detox the day before after staying at the Carroll Hospital Center in Maryland for suicidal ideations. (AR 1022, 1026). Dr. Seed shared his concerns about plaintiff and his release with another physician who was going to review plaintiff's file. (AR 1022). According to Daniel Manza, L.C.S.W., who completed an Assessment of Serious Mental Illness Form on March 25, 2015, plaintiff had, after each of his administrative discharges, attempted to "hold people emotionally hostage until he gets what he wants, which (in these cases) is readmission." (AR 1024–27). Thus, plaintiff would use drugs and alcohol excessively and couple this with threats to harm himself. (AR 1026). Dr. Manza found plaintiff did not have a serious mental illness as defined by state Medicaid. (AR 1027).

Plaintiff did not show up to a scheduled appointment with Dr. Seed on March 25, 2015. (AR 1028). Dr. Seed expressed concern that plaintiff was on Tramadol and wanted it to be explained to plaintiff that this was unwise and dangerous given the high risk of seizures associated with the medication, a risk that only increased further in the presence of alcohol. (*Id.*). Plaintiff did attend a meeting with Dr. Seed on April 9, 2015 and reported that he was doing well, not having had alcohol or taken drugs for the previous week. (AR 1036). He was taking Trazodone but had decided not to take Seroquel or lithium anymore. (*Id.*). He was calm, cooperative, pleasant, alert, and oriented to person, place, time, and situation. (AR 1038). His affect and mood were congruent, he denied depression, vegetative symptoms, or mood dysregulation, and he had no suicidal or homicidal thoughts, plans, or intentions. (*Id.*). Plaintiff was found to have fair insight and judgment and was capable of making both personal and medical decisions. (*Id.*). A discharge summary dated May 18, 2015 indicates that plaintiff missed his last appointment, disengaged from treatment, and his whereabouts were unknown. (AR 1041–42).

On August 19, 2015, plaintiff requested the detox services of the ACSB following difficulties over the previous few months with alcohol, cannabis, and heroin use. (AR 1047). He also reported difficulty in remembering the previous eight months, describing it as a "blur." (*Id.*). Since his last detox, plaintiff admitted to using substances "on and off" but in the past two months, his use had increased to daily use of heroin, marijuana, and alcohol. (*Id.*). Notably, this began when he started renting rather than staying in an ACSB shelter. (AR 1049). Plaintiff did not have any family members in the area or a sober network in place, but did note that he was in a relationship, although this was somewhat volatile. (AR 1048, 1050). At the time of his clinical intake on August 24, 2015, plaintiff did not want mental health services because he believed his drug use contributed to his depressive symptoms. (AR 1048). He also expressed disagreement with a recent diagnosis of Bipolar Affective Disorder, Mixed, State 2, that he received during his stay at Carroll Hospital Center, again stating that his behavior was substance use induced. (AR 1054). Plaintiff admitted that he had reported suicidal ideations in order to be hospitalized when the weather outside was cold and he needed a place to stay. (AR 1048). During his intake interview, plaintiff was alert, responsive, well-nourished, with a cooperative and pleasant attitude. (AR 1056). His judgment and memory were noted as impaired and he had little insight. (AR 1057). He was considered at "moderate risk of harm" but it was noted that upon discharge, this could increase to a serious risk given his episodes of suicidal ideations and attempts while intoxicated. (AR 1059). Plaintiff requested to be placed in a Methadone Maintenance Program, therapy, and groups to continue working on his substance abuse and address his recent relapse. (AR 1049, 1054). His recommended treatment plan was to complete detox and transition to Phase II, attend all groups and meetings, regularly meet with staff to discuss ongoing treatment, and maintain change and smoking cessation. (AR 1055). Plaintiff was referred to therapy and

AA and NA self-help groups. (*Id.*). He also requested assistance to address his relationship issues. (AR 1063).

Plaintiff was discharged from the detox program on October 1, 2015. (AR 1076). He reported feeling "really good this time" about his sobriety as he had more "tools" to use. (*Id.*). He also intended to reconnect with his network and be active in his recovery. (*Id.*). During his admission, plaintiff was cooperative, took his medication as prescribed, and attended all scheduled health education activities. (*Id.*). He actively participated in the group discussions and successfully completed the "Smoking Cessation" group. (AR 1077). He also attended ten sessions of "Considering and Maintaining Change" and attended 12-Step meetings between five and six times a week. (*Id.*). Upon his discharge, plaintiff was to follow up with his therapist and counselor, attended MATRIX, attend AA, NA, and 12-Step meetings, and network. (*Id.*).

On December 9, 2015, plaintiff arrived for a scheduled intake interview to the ACSB detox program Phase I. (AR 1080). He was informed that he had a residential interview appointment at 1:00 p.m. that day, so went to that interview and returned to the unit shortly thereafter. (*Id.*). Plaintiff was found to have no alcohol in his system, but his urine tested positive for marijuana, benzodiazepine, and methadone. (*Id.*). On the same day, plaintiff was observed collecting his belongings together and walking out of the detox program, providing no reason as to why he was leaving. (*Id.*). Although it is not clear when plaintiff next checked into the detox program, the medical records include a discharge summary note detailing plaintiff's discharge from the ACSB Phase II program on January 21, 2016. (AR 1083). Plaintiff was in a good mood, joking with staff, and expressed that he was looking forward to coming back for his classes. (*Id.*). He had successfully secured a bed in New Hope Housing. (*Id.*).

Plaintiff had an annual review with the ACSB on August 24, 2016. (AR 1129). He was found to have struggled to effectively manage his addictive behaviors and maintain sobriety. (*Id.*). He had attended detox five times in the review period, transitioning to the ACSB shelter after each admission, but subsequently being discharged from the shelter due to positive drug screens or not following program rules. (*Id.*). Plaintiff had also been admitted to the Methadone program early in the review period. (*Id.*). He reported ending his stressful romantic relationship and, as a result, had established and maintained healthy boundaries. (*Id.*). Plaintiff had not obtained employment or stable housing. (*Id.*).

On August 31, 2016, plaintiff was discharged from the ACSB detox Phase I and Phase II programs to transition to the Crossroads Treatment Center. (AR 1138). During this most recent attempt at detox, plaintiff had shown great leadership qualities, encouraging others daily, following all directions, and being punctual for all meetings. (*Id.*). He was described as "alert and disciplined." (*Id.*). After finishing the treatment program at Crossroads, plaintiff was directed to follow up with his therapist. (AR 1139).

Just under a year later, plaintiff's records indicate that he was discharged from the ACSB detox Phase II program on July 9, 2017. (AR 1144). He had sought detox to address a recent relapse on marijuana and benzodiazepines. (*Id.*). This relapse followed his completion of the Crossroads treatment plan and plaintiff was looking to get back on track. (*Id.*). He requested the discharge after finding out that Robinson House had an opening which would provide him with safe sober housing. (*Id.*). Plaintiff was found to be alert and oriented, engaging in meaningful conversations when focused. (*Id.*). Following his transition, plaintiff was to attend dosing daily and continue with outpatient and substance abuse programs as scheduled. (AR 1145). He was to

also follow up with his therapist and attend ninety meetings in ninety days of the 12-Step Recovery program. (*Id.*).

On August 25, 2017, plaintiff was administratively discharged from the ACSB detox program after being found with a Suboxone pill. (AR 1151). Upon being informed of his discharge, plaintiff responded that he was going to commit suicide later that day. (*Id.*). Svandia Gerisdottier at the detox program immediately called the Mental Health Center and informed them that plaintiff was willing to come to the Center to be evaluated. (*Id.*). The Center recommended that Ms. Gerisdottier call 911 if plaintiff tried to leave, given his remarks. (*Id.*). Plaintiff reported that he felt he could not continue trying anymore and wanted to end it all. (AR 1152). He felt that he had no support and that his family had "kicked him out" two years ago because of his addictions. (AR 1160). Detox staff had removed plaintiff's razors from his belongings that morning, but while at the Center he reported that he could not keep himself safe, so asked for the removal of all pens, sharp objects, cards, and paper. (AR 1152). Plaintiff's symptoms included high anxiety, stress, emotional pain, increased depressive symptoms, social withdrawal, and hopelessness. (AR 1157). His mood was depressed, affect constricted, and judgment poor. (AR 1157–58). Plaintiff also reported hearing voices but was unsure whether this was his own internal voice. (AR 1158). He also noted that sometimes he thought he had seen someone, but when he turned around there was no one there. (AR 1161). It was determined that as plaintiff felt he could not keep himself safe because of his suicidal ideations, intent, and plan with access to means, he needed inpatient hospitalization. (AR 1160, 1162). Furthermore, it was noted that if plaintiff no longer voluntarily agreed to go to the hospital, a TDO was to be sought. (AR 1162).

Plaintiff was transferred by the police to Alexandria Hospital later the same day. (AR 1091). While plaintiff was at the hospital, staff there contacted the ACSB who were currently looking for a bed for plaintiff. (AR 1099). A few hours later, the ACSB called to confirm that plaintiff had been accepted at Dominion Hospital and reiterated that if plaintiff changed his mind about being hospitalized, a TDO would be needed. (*Id.*). Plaintiff was informed of the plan and told nurses that he wanted to smoke. (*Id.*). It was explained that if he left the campus, he would be arrested. (*Id.*). Plaintiff was transferred to Dominion Hospital later that day as planned. (AR 1093, 1100).[9]

On February 28, 2018, Barbara Arnold, L.P.C., completed a mental health and substance abuse annual review for plaintiff. (AR 1185). Dr. Arnold noted that plaintiff had entered the Crossroad Program in the review year and was able to achieve sobriety during his seven-month stay there. (*Id.*). Plaintiff was then transferred to Carpenter's Shelter upon discharge and it was then that he began to use again. (*Id.*). His petitions to enter into the ACSB detox Phase II program were denied due to several past breaches of the rules. (*Id.*). Plaintiff was homeless during the Fall of 2017 and stayed at Dave's Place when the facility opened. (*Id.*). His use of illicit drugs progressed from tetrahydrocannabinol ("THC") to cocaine and benzodiazepines, until he was placed on Therapeutic Intervention Status on February 16, 2018 for "egregious drug use while being on medication assisted treatment." (*Id.*). His physician, Dr. Mian, laid out several requirements for treatment and noted that he would discharge plaintiff if he tested positive for other substances beyond THC and that eventually, he was to test negative for that substance too. (*Id.*). At the time of the annual review, plaintiff was living at the Alexandria

---

[9] The AR does not contain any records from Dominion Hospital concerning this admission.

Community Shelter and was attending support groups and individual therapy. (*Id.*). He was also to start attending the MATRIX program to further support his recovery. (*Id.*). Dr. Arnold noted that plaintiff had a "fair prognosis" if he engaged seriously in treatment and that if he could fully commit to treatment for a sustained period of time, he could retain his recovery. (AR 1187). A March 7, 2018 treatment plan from ACSB indicates that plaintiff was beginning a methadone treatment plan. (AR 1178–81).

Plaintiff self-reported to Alexandria Hospital on March 25, 2018 complaining of an anxiety attack. (AR 1110–11). He was seen by Amit Chandra, M.D., and explained that he had recently been through several "ups and downs" and was now living in a homeless shelter. (AR 1114). He had been unable to sleep for the past few weeks and could not relax. (*Id.*). That morning, plaintiff had taken a dose of Seroquel, but it had little effect. (*Id.*). He was on Methadone therapy and denied any suicidal or homicidal ideations or hallucinations. (*Id.*). Dr. Chandra monitored plaintiff's pulse for approximately an hour. (AR 1117). After resting comfortably and feeling much better, plaintiff was discharged. (*Id.*).

John Rennick, M.D., performed a psychiatric evaluation of plaintiff on April 5, 2018. (AR 1172). Plaintiff reported that he was experiencing a lot of emotions and stress which had led to his first ever panic attack. (*Id.*). He was referred for an evaluation following his recent ER visit. (*Id.*). Plaintiff explained that he had been sober for a month, although Dr. Rennick noted that plaintiff's first clean urine did not show up until several days before their meeting. (*Id.*). Plaintiff wanted to "turn over a new leaf" but living drug-free meant he was now experiencing long-suppressed emotions causing him stress and panic attacks. (*Id.*). He requested something for his anxiety, noting in the past he benefited from a combination of Seroquel and Ativan. (*Id.*). He suffered from chronic interrupted sleep, averaging between five to six hours per night and

waking early. (AR 1172–73). He smoked, including during the night while awake. (AR 1173).

Plaintiff denied depression, although did have a PHQ-9[10] score of 20. (*Id.*). He also denied any

suicidal ideations over the past month but admitted some episodic death wishes and passive

suicidal ideations when he felt at his most dysfunctional, for example during inpatient detox.

(*Id.*). Dr. Rennick detailed that plaintiff was to continue with the current services he was

utilizing, notably outpatient services with medication management and the Methadone program.

(AR 1176). It was also noted that plaintiff was to live at Windsor House starting on April 20,

2018. (*Id.*).

### D. The ALJ's Decision on August 7, 2018

The ALJ concluded that plaintiff was not disabled under sections 216(i), 223(d) and

1614(a)(3)(A) of the Social Security Act based on his application for DIB and SSI for the period

July 1, 2006 through the date of the decision, August 7, 2018. (AR 37). When determining

whether an individual is eligible for DIB and/or SSI, the ALJ is required to follow a five-step

sequential evaluation. It is this process the court examines to determine whether the correct legal

standards were applied and whether the ALJ's final decision is supported by substantial

evidence. *See* 20 C.F.R. §§ 404.1520(a), 416.920(a).

Specifically, the ALJ must consider whether a claimant: (1) is currently engaged in

substantial gainful employment; (2) has a severe impairment; (3) has an impairment that meets or

equals any of the impairments listed in Appendix 1, Subpart P of the regulations that are

---

[10] The Patient Health Questionnaire-9 is a self-administered scale that helps clinicians assess for depression. *Patient Health Questionnaire (PHQ-9 & PHQ-2)*, AM. PSYCHOL. ASS'N, https://www.apa.org/pi/about/publications/caregivers/practice-settings/assessment/tools/patient-health (last visited Feb. 6, 2020). The nine items on the scale incorporate depression criteria from the DSM-IV. *Id.* The scale assists in screening and diagnosing depression, as well as selecting and monitoring treatment. *Id.*

considered *per se* disabling; (4) has the ability to perform past relevant work; and (5) if unable to

return to past relevant work, whether the claimant can perform other work that exists in

significant numbers in the national economy. *See* 20 C.F.R. §§ 404.1520(a), 416.920(a). For the

first four steps of this analysis, the claimant bears the burden to prove disability. *See* 20 C.F.R.

§§ 404.1560(c)(2), 416.960(c)(2). The burden then shifts to the Commissioner at step five. 20

C.F.R. §§ 404.1560(c)(2), 416.960(c)(2). When considering a claim for DIB, the Commissioner

must determine whether the insured status requirements of sections 216(i) and 223 of the Social

Security Act are met. *See* 42 U.S.C. §§ 416(i), 423. (AR 19). The regulations promulgated by

the Social Security Administration also provide that all relevant evidence will be considered in

determining whether a claimant has a disability. *See* 20 C.F.R. §§ 404.1520(a)(3),

416.920(a)(3).

Furthermore, when a claimant's case includes medical evidence of a substance use

disorder, the ALJ must conduct additional analysis to determine whether the substance use

disorder is a "contributing factor material to the . . . determination that the individual is

disabled." 42 U.S.C. § 423(d)(2)(C). The ALJ evaluates the extent to which the claimant's

mental and physical limitations would remain if the claimant stopped substance use. 20 C.F.R.

§§ 404.1535, 416.935. The substance use is considered a contributing factor material to the

determination of disability if the remaining limitations would not be disabling if the claimant

stopped substance use. 20 C.F.R. §§ 404.1535(b)(2)(i), 416.935(b)(2)(i). In that case, the

claimant would not be disabled. 20 C.F.R. §§ 404.1535(b)(2)(i), 416.935(b)(2)(i).

Here, the ALJ made the following findings of fact:

(1) The claimant met the insured status requirements of the Social Security Act
through December 31, 2006;

(2) The claimant has not engaged in substantial gainful activity since July 1, 2006, the alleged onset date;

(3) The claimant has the following severe impairments: substance use disorder, affective mood disorder, personality disorder, and organic mental disorder;

(4) The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1;

(5) Based on all of the impairments, including the substance use disorder, the claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: He is limited to jobs involving simple, routine, and repetitive tasks with no production rate for pace of work and with no more than occasional interaction with supervisors, coworkers, and the general public. Further, he is limited to jobs with no more than occasional changes in the work setting that require no more than occasional use of judgment or decision-making. The claimant would be off-task more than 20 percent of the workday due to drug and alcohol addiction;

(6) The claimant has no past relevant work;

(7) The claimant was born in 1984 and was 21 years old, which is defined as a younger individual age 18–49, on the alleged disability onset date;

(8) The claimant has a limited education and is able to communicate in English;

(9) Transferability of job skills is not an issue because the claimant does not have past relevant work;

(10) Considering the claimant's age, education, work experience, and residual functional capacity based on all of the impairments, including the substance use disorder, there are no jobs that exist in significant numbers in the national economy that the claimant can perform;

(11) If the claimant stopped the substance use, the remaining limitations would cause more than a minimal impact on the claimant's ability to perform basic work activities; therefore, the claimant would continue to have a severe impairment or combination of impairments;

(12) If the claimant stopped the substance use, the claimant would not have an impairment or combination of impairments that meets or medically equals any of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1;

(13) If the claimant stopped the substance use, the claimant would have the residual functional capacity to perform a full range of work at all exertional levels

but with the following nonexertional limitations: He is limited to jobs involving simple, routine, and repetitive tasks with no production rate for pace of work and with no more than occasional interaction with supervisors, coworkers, and the general public. Further, he is limited to jobs with no more than occasional changes in the work setting that require no more than occasional use of judgment or decision-making;

(14) The claimant does not have past relevant work;

(15) Transferability of job skills is not an issue because the claimant does not have past relevant work;

(16) If the claimant stopped the substance use, considering the claimant's age, education, work experience, and residual functional capacity, there would be a significant number of jobs in the national economy that the claimant could perform;

(17) The substance use disorder is a contributing factor material to the determination of disability because the claimant would not be disabled if he stopped the substance use. Because the substance use disorder is a contributing factor material to the determination of disability, the claimant has not been disabled within the meaning of the Social Security Act at any time from the alleged onset date through the date of this decision. (AR 21–37).

The Appeals Council declined to review this second ALJ decision, finding no reason to do so under its rules. (AR 1–3).

## IV. ANALYSIS

### A. Overview

Plaintiff's motion for summary judgment argues that the ALJ committed two errors. (Docket no. 14 at 5–13). Plaintiff's first argument centers on the ALJ's determination that plaintiff's substance abuse was material to the determination of disability. (*Id.* at 5–12). He contends that the ALJ's decision was not based on a "full and fair" record; specifically, that the ALJ relied on "few and far between" periods of abstinence and that a consultative examiner should have been retained to review plaintiff's file. (*Id.* at 9–11). Plaintiff's second argument asserts that substantial evidence does not support the ALJ's residual functional capacity assessment because he failed to define the term "no production rate for pace of work." (*Id.* at

12–13). For the reasons discussed below, the undersigned finds that the ALJ's determination that plaintiff's substance abuse was material to the determination of disability was based on a "full and fair" record. However, the undersigned finds that the ALJ did not sufficiently define the limitation "no production rate for pace of work" included in plaintiff's residual functional capacity thereby precluding the court from meaningfully assessing whether a "logical bridge" exists between the assessment and the evidence in the record.

### B. The ALJ's Decision that Plaintiff's Substance Abuse was a Contributing Factor Material to the Determination of Disability is Based on a Full and Fair Record

Plaintiff argues that the ALJ's determination concerning the materiality of plaintiff's substance abuse on his disability claim was not based upon a "full and fair" record thereby warranting remand. (Docket no. 14 at 5–11). Relying on Social Security Ruling 13-2p ("SSR 13-2p") and two unpublished decisions—*Hagan v. Colvin*, No.1:12cv339, 2013 WL 1798336 (W.D.N.C. Apr. 29, 2013) and *Thornhill v. Colvin*, No. 13-530, 2014 WL 1328153 (W.D. Pa. Apr. 2, 2014)—plaintiff contends that there is a paucity of medical opinion evidence in his case that addresses the materiality of his substance abuse. (*Id.* at 8–9). Specifically, plaintiff argues that the brief periods of abstinence that the ALJ relied on to reach the determination that plaintiff's substance abuse was material do not indicate any medical improvement to demonstrate plaintiff's ability to work full time, but instead show psychiatric hospitalizations and self-harm. (*Id.* at 10–11). Additionally, plaintiff asserts that the record lacks any consultative examiner opinions, treating source opinions, or medical expert opinions on this issue. (*Id.* at 9). Plaintiff argues that a remand is warranted to make a "proper" materiality analysis based upon a full and fair record, and that the best remedy would be to call upon a medical expert, preferably a psychologist, to review plaintiff's file. (*Id.* at 11).

44

In response, the Commissioner asserts that substantial evidence supports the ALJ's determination that plaintiff's substance use was material to the determination of his disability and that the decision was based on a "full and fair" record. (Docket no. 21 at 15–23). As a preliminary matter, the Commissioner contends that contrary to plaintiff's claim, an ALJ is not obligated to obtain the opinion of a consultative examiner to review a claimant's file to evaluate the relationship between substance use and disability. (*Id.* at 16). Next, the Commissioner argues that plaintiff mischaracterizes the ALJ's analysis as resting only on "few and far between" periods of abstinence when, in fact, the ALJ extensively analyzed plaintiff's mental health history over several periods of sobriety. (*Id.* at 15). In support of this assertion, the Commissioner contends that the ALJ assessed both plaintiff's limitations with and without substance abuse. (*Id.* at 19). The Commissioner goes on to summarize several treatment records which the ALJ included in his decision to demonstrate that the ALJ considered the facts surrounding these periods of sobriety. (*Id.* at 19–21). Moreover, the Commissioner points to plaintiff's testimony at the two ALJ hearings which "provided insight into how substance use exacerbated his mental health symptoms" which the ALJ also fully considered in his decision. (*Id.* at 21–22). The Commissioner concludes that the ALJ set forth substantial evidence to support his determination of plaintiff's substance use as material. (*Id.* at 23).

When there is medical evidence of substance use disorder in the record, the ALJ must consider whether that substance use disorder is a contributing factor material to the determination of disability. 42 U.S.C. § 423(d)(2)(C) ("An individual shall not be considered to be disabled . . . if alcoholism or drug addiction would (but for this subparagraph) be a contributing factor material to the Commissioner's determination that the individual is disabled."); *see also* 20 C.F.R. §§ 404.1535(a), 416.935(a) ("If we find that you are disabled and

45

have medical evidence of your drug addiction or alcoholism, we must determine whether your drug addiction or alcoholism is a contributing factor material to the determination of disability[.]"). In making this decision, the ALJ "evaluate[s] which of [the claimant's] current physical and mental limitations, upon which [the ALJ] based [the] current disability determination, would remain if [the claimant] stopped using drugs or alcohol and then determine whether any or all of [the claimant's] remaining limitations would be disabling." 20 C.F.R. §§ 404.1535(b)(2), 416.935(b)(2). The claimant bears the burden to prove that he would still be disabled if he stopped using alcohol or drugs. *Harris v. Colvin*, No. 1:14CV1005, 2016 WL 698083, at *5 (M.D.N.C. Feb. 19, 2016) (collecting cases); *see also* SSR 13-2p ("[I]t is our longstanding policy that the claimant continues to have the burden of proving disability through the DAA [Drug Addiction and Alcoholism] materiality analysis.").

Here, at step five of the sequential evaluation, the ALJ found plaintiff disabled considering all his impairments, including plaintiff's substance use disorder, which precluded him from making a "successful vocational adjustment to work that exists in significant numbers in the national economy." (AR 31). Given the existence of medical evidence in the record showing substance use disorder, the ALJ proceeded to a materiality analysis of plaintiff's substance use disorder on the determination of disability. (*See* AR 31–37.). The ALJ determined that plaintiff would continue to have a severe impairment or combination of impairments absent plaintiff's substance use, although those impairments would not meet or medically equal any of those listed in 20 C.F.R., Part 404, Subpart P, Appendix 1. (AR 31). The ALJ then found plaintiff's substance use disorder was a contributing factor that was material to the determination of disability. (AR 22). As such, the ALJ determined that:

> [I]f [plaintiff] stopped the substance use, [plaintiff] would have the residual functional capacity to perform a full range of work at all exertional levels but with

the following nonexertional limitations: He is limited to jobs involving simple, routine, and repetitive tasks with no production rate for pace of work and with no more than occasional interaction with supervisors, coworkers, and the general public. Further, he is limited to jobs with no more than occasional changes in the work setting that require no more than occasional use of judgment or decision-making.[11]

(AR 33–34).

To support his determination, the ALJ explained how plaintiff's mental limitations would change absent substance use. (AR 34–36). It is at this juncture that plaintiff argues the ALJ did not develop a full and fair record. (Docket no. 14 at 7). Plaintiff contends that to show the impact of a claimant's impairments, a straightforward analysis would allow for an evidentiary comparison between periods of substance abuse and periods of sobriety. (*Id.* at 6–7). However, in more "gray" cases, which plaintiff asserts is the case here, the analysis is more difficult when there is a lack of sustained periods of sobriety. (*Id.* at 7). This lack of sustained periods of sobriety or remission placed plaintiff's case into a "state of evidentiary equipoise" and made the ALJ's job of conducting a meaningful materiality analysis all the more difficult. (*Id.*). Although plaintiff acknowledges the lack of on-point cases that address what an ALJ is required to do when there are few periods of abstinence, plaintiff does cite to two unpublished cases where the matter was remanded. (*Id.* at 9). However, both of those cases are inapposite.

In the first case, *Hagan v. Colvin*, the court granted the Commissioner's voluntary remand and directed the Appeals Council to instruct the ALJ to conduct a new hearing on a number of issues. 2013 WL 1798336, at *1. More specifically, the ALJ was to further evaluate

---

[11] Plaintiff's residual functional capacity at step five of the sequential evaluation, which included consideration of plaintiff's substance use disorder, contained one further additional limitation: that "the claimant would be off-task more than 20 percent of the workday due to drug and alcohol addiction." (AR 24). The ALJ removed this limitation in plaintiff's residual functional capacity after finding plaintiff's substance use disorder material to the determination of disability. (AR 33–34).

the claimant's alcohol dependency in accordance with SSR 13-2p and, "if deemed necessary," to obtain a medical expert to ascertain the impact the claimant's alcohol dependency had on his ability to work. *Id.* *Hagan* is a consent remand order and contains no analysis or facts to support plaintiff's argument. Additionally, the court *suggested* that the ALJ could obtain a medical expert's opinion to help determine if the claimant's substance use was material; the court did not remand the case for this purpose. *See id.* An ALJ is not required to obtain the opinion of a consultative expert to evaluate a claimant's substance abuse and the impact this has on the claimant's disability determination. *Delk v. Colvin*, 675 F. A'ppx 281, 284 (4th Cir. 2017) ("[T]he ALJ was not obligated—either as a general matter or based on the facts of this case—to obtain the opinion of a consultative examiner regarding the interplay between his drinking and his disability."). Thus, the ALJ's determination that plaintiff's substance use disorder was material is not undermined by the decision not to seek the opinion of a consultative expert.

In the second case plaintiff cites, *Thornhill v. Colvin*, the court found that the ALJ's finding of materiality was not supported by substantial evidence as the record included no evidence, opinion, or testimony that provided insight into the impact of claimant's substance abuse on her ability to work. 2014 WL 1328153, at *7. The court held that the ALJ's finding of materiality was based on an "inference" that the claimant's "'mental status' and 'overall function' would improve if she were able to attain 'long-term sobriety.'" *Id.* at *6. As such, the court remanded the case for further consideration of the claimant's application for SSI benefits, noting that it was the Commissioner's responsibility to develop a "full and fair record" and support a finding of materiality with substantial evidence. *Id.* at *8–9. Plaintiff asserts that his case presents the same situation. (Docket no. 14 at 9). Although *Thornhill* is closer to the facts in this case than *Hagan*, it is an out-of-circuit case with two essential differences from plaintiff's

48

case. First, the record here is replete with medical evidence, opinion, and testimony that provide insight into the impact of plaintiff's substance use disorder on his ability to work. Second, following on from this, the ALJ did not base his materiality finding on an "inference," but instead supported his determination with several citations to the record and a detailed consideration of plaintiff's limitations with and without substance use, to include analysis of plaintiff's periods of abstinence. (*See* AR 31–36).

In determining plaintiff's residual functional capacity absent his substance use disorder, the ALJ first referred to plaintiff's treatment records before he became "drug involved" in the middle of 2000. (AR 34). Noting that plaintiff was an excellent gymnast, an active member of his youth group, and had a job, the ALJ found that plaintiff's subsequent withdrawal from these activities accompanied by cessation of the taking of his medication suggested that his impairments were "adequately controlled by medication" before plaintiff's substance use disorder. (*Id.*). As such, it was the substance use that caused plaintiff's "decreased ability to function." (*Id.*). The ALJ then proceeded to review treatment records from after the alleged onset date and where plaintiff was not using substances, noting that examinations revealed "relatively mild findings." (AR 34–36). For example, the ALJ detailed plaintiff's treatment at the National Institutes of Health program from April 3, 2014 through to May 14, 2014, where although plaintiff showed signs of anxiety and impaired insight, he was also alert, oriented, interactive, cooperative, with articulate speech and goal-directed thought processes. (AR 35). The ALJ also referred to plaintiff's treatment at INOVA hospital from January 17, 2015 through to January 22, 2015 where plaintiff, upon discharge, had "normal" speech, thought processes, attention, and concentration. (*Id.*). He was also cooperative, fully oriented, with a "fine" mood and affect. (*Id.*). The ALJ noted similar examination findings contained in the treatment records

pertaining to plaintiff's readmission to the ACSB Phase II detox program on February 19, 2015. (*Id.*). Just five days later, Dr. Manza found plaintiff alert, happy, attentive, with good eye contact, logical thought processes, normal thought content, and normal orientation and speech. (*Id.*). The ALJ's analysis of plaintiff's periods of abstinence covered a range of time, from the beginning of plaintiff's substance use to within a few months of the date of the ALJ's decision, and included periods of varying length, from a week to well over a month. (AR 34–36).

This analysis of plaintiff's periods of abstinence by the ALJ followed a comprehensive consideration of those periods of time where plaintiff was using substances. (AR 24–28). This consideration—at step five of the sequential evaluation before proceeding to the materiality analysis of plaintiff's substance use disorder on the determination of disability—included several treatment records pertaining to hospital stays, psychiatric evaluations, and detox services. (*Id.*). For example, the ALJ referred to plaintiff's stay at Eagleville Hospital from January 11, 2013 to February 8, 2013 where he was admitted for ongoing problems with drugs. (AR 26). Plaintiff reported that his drug use was negatively interfering with his employment, education, and interpersonal relationships. (*Id.*). The ALJ included an evaluation of a later stay, this time at Temple University Hospital, where plaintiff was receiving mental health treatment after cutting his thigh. (AR 27). At that time, plaintiff admitted to taking up to twenty pills of Xanax and Klonopin and snorting up to 1.5 bundles of heroin daily, and his drug screen tested positive for opiates and benzodiazepines. (*Id.*). He was found to be disheveled with a euthymic mood and limited insight and judgment, although his thought processes were considered linear. (*Id.*).

The ALJ's decision also included hearing testimony from plaintiff and plaintiff's father, again at step five of the sequential evaluation. (AR 24–25). Plaintiff testified that he had not consumed alcohol for a year and had remained sober from all drugs for sixty days prior to the

ALJ hearing. (AR 24). In those sixty days, he had anxiety, claustrophobia, paranoia, and difficulty focusing, but stated that he was able to concentrate. (*Id.*). He also testified that he showered and dressed without reminders, prepared his own meals, cleaned his room, washed his laundry, walked to his group therapy appointments, and took the subway by himself to get to the hearing. (*Id.*). Plaintiff's father's testimony referred to plaintiff's past visits to his parents' home in January 2018 and Thanksgiving of the same year and opined that plaintiff had difficulty sticking to tasks and programs. (AR 25). The ALJ also summarized prior reports submitted by plaintiff's father concerning plaintiff, his substance abuse, his daily activities, and his living situation. (*Id.*).

Accounting for the above, plaintiff's case is remarkably different than *Thornhill*. In *Thornhill* the ALJ stated that the record did not reveal a credible established period of sobriety and therefore he was required to make an inference as to what extent the claimant's mental status and overall functioning would improve if she was to attain long-term sobriety. 2014 WL 1328153, at *6. Here, the ALJ did not need to infer what plaintiff's mental status and overall function would be absent substance use because the record contained several treatment records, to include medical records, opinions, and testimony, that allowed the ALJ to conduct a meaningful assessment. The ALJ included a detailed discussion of treatment records both where plaintiff was using substances and where he was not using substances. This included comparing plaintiff's condition prior to in-patient hospitalization (where there would be a credible period of sobriety) to his condition at the time of discharge. This allowed for the "evidentiary comparison" plaintiff refers to in making his argument.

In a related argument, plaintiff contends that the ALJ's interpretation of "six short-lived periods of purported abstinence" as showing plaintiff can work full time is "respectfully odd."

(Docket no. 14 at 11). In support, plaintiff points to one period of sobriety as following an episode of self-harm by plaintiff and another period of sobriety during which plaintiff was hospitalized for a panic attack. (*Id.*). Plaintiff argues that, in contrast to the ALJ's conclusions, the record actually demonstrates that plaintiff has not sustained any meaningful periods of sobriety. (*Id.*). Plaintiff's argument is unpersuasive. The ALJ referenced several periods of abstinence included in the administrative record: these included plaintiff's self-reports of sobriety as well as stays in treatment centers or in hospitals. (AR 34–36). Not all were brief periods of abstinence: some were "short-lived," but others were longer; for example, one period of sobriety lasted for more than a month during plaintiff's stay at the National Institutes of Health program. (AR 35).[12]

Additionally, the ALJ's conclusion that plaintiff was able to work full time as indicated by these periods of abstinence was based on reported findings of the changes in plaintiff's behavior and capabilities as a result of sobriety or findings that showed plaintiff's mental abilities as "normal." (*See id.*). For example, the ALJ referenced Dr. Rennick's finding that plaintiff's "appearance, speech, range of affect, thought process, thought content, orientation, sensory examination, and memory were within normal limits" following plaintiff's self-report of sobriety for approximately one month. (AR 35–36). Evidence such as this provided the rationale for the only change the ALJ made to the plaintiff's residual functional capacity based on his finding that plaintiff's substance use disorder was a contributing factor material to the determination of disability; namely, the removal of the limitation that plaintiff "would be off-task

---

[12] While it is unfortunately true that plaintiff has been unable to maintain his sobriety for extensive periods of time, the analysis required by SSR 13-2p is not whether a claimant will be able to maintain sobriety but what would be the change in a claimant's limitations if the claimant stopped the substance use.

more than 20 percent of the workday due to drug and alcohol addiction." (AR 24). The

evidence in the record concerning plaintiff's concentration, persistence, pace, judgment, and

memory during his limited periods of sobriety provide substantial evidence to support the ALJ's

decision to remove this "off-task" limitation. (*See* AR 32, 35–36).

Accordingly, the ALJ developed a "full and fair" record upon which to base his

conclusion that plaintiff's substance use disorder was material to the determination of disability.

Substantial evidence in the record supports the ALJ's decision.

### C.     The ALJ's Failure to Define or Explain the Limitation "No Production Rate for Pace of Work" in Plaintiff's Residual Functional Capacity Requires Remand

Plaintiff's second challenge asserts that the ALJ failed to adequately define or explain the

meaning of the limitation "no production rate for pace of work" included in plaintiff's residual

functional capacity assessment. (Docket no. 14 at 12–13, Docket no. 23 at 1–4). In support of

this argument, plaintiff cites to two recent cases—*Thomas v. Berryhill*, 916 F.3d 307 (4th Cir.

2019) and *Perry v. Berryhill*, 765 F. App'x 869 (4th Cir. 2019)— where the Fourth Circuit found

the ALJ's failure to define a production-related limitation left the court unable to meaningfully

assess whether a logical bridge existed between the ALJ's conclusions and the evidence in the

record. (Docket no. 14 at 12–13, Docket no. 23 at 1–2). Plaintiff argues that his case is

indistinguishable from either *Thomas* or *Perry* and therefore this court should remand the ALJ's

decision. (Docket no. 14 at 13, Docket no. 23 at 4).

The Commissioner responds that the ALJ adequately reviewed the evidence in the record

and explained his decision, therefore substantial evidence supports plaintiff's residual functional

capacity. (Docket no. 21 at 23–29). Specifically, the Commissioner asserts that the inclusion of

an additional protective restriction—in this case that plaintiff was limited to jobs "with no

production rate for pace of work,"—in a residual functional capacity assessment where the ALJ

had already limited the simplicity of the work to account for plaintiff's "moderate" ability to

maintain concentration, persistence, or pace, does not undermine the substantial evidentiary basis

of the ALJ's decision. (*Id.* at 25). The Commissioner goes on to argue that plaintiff

misunderstands the holdings of *Thomas* and *Perry* respectively, and that plaintiff's case is more

akin to *Sizemore v. Berryhill*, 878 F.3d 72 (4th Cir. 2017), where the Fourth Circuit found the

ALJ's residual functional capacity assessment, which included a production-related limitation,

was supported by substantial evidence in the record. (Docket no. 21 at 27). The final argument

by the Commissioner contends that the "plain words" of the residual functional capacity

assessment shows the ALJ's reasoning. (*Id.* at 28). The Commissioner asserts that the ALJ first

provided the tasks that plaintiff could perform, namely "simple, routine, and repetitive tasks,"

and second provided a limitation which expressly stated that it dictated the pace at which

plaintiff could handle these tasks. (*Id.*). The Commissioner suggests that plaintiff is simply

relying on a "superficial linguistic similarity" with the *Thomas* and *Perry* cases, thus a remand is

not required here. (*Id.*).

      At step three of the sequential analysis, if the ALJ finds the claimant's impairments do

not meet the requirements of the Listed Impairments in Appendix 1, then the ALJ must

determine the claimant's residual functional capacity. 20 C.F.R. §§ 404.1520(e), 416.920(e).

Residual functional capacity is "the most [the claimant] can still do despite [his] limitations." 20

C.F.R. §§ 404.1545(a)(1), 416.945(a). It is based "on all the relevant evidence in [the] case

record." 20 C.F.R. §§ 404.1545(a)(3), 416.945(a). The residual functional capacity

determination incorporates both objective medical evidence alongside the claimant's subjective

statements, whether those statements are based on formal medical examinations or not. 20

C.F.R. §§ 404.1545(a)(3), 416.945(a)(3). When assessing a claimant's residual functional capacity, the ALJ considers the claimant's ability to meet "the physical, mental, sensory, and other requirements of work." 20 C.F.R. §§404.1545(a)(4), 416.945(a)(4). Generally, it is the claimant's responsibility to provide the evidence that the ALJ utilizes in making the residual functional capacity determination; however, before determining that a claimant is not disabled, the ALJ must develop the claimant's complete medical history. 20 C.F.R. 404.1545(a)(3), 416.945(a)(3).

Social Security Ruling 96-8p ("SSR 96-8p") provides the analytical framework by which an ALJ determines a claimant's residual functional capacity. The assessment "must first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis, including the functions listed in the regulations." *Mascio*, 780 F.3d at 636 (citing SSR 96-8p). Further, the "assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (*e.g.*, laboratory findings) and nonmedical evidence (*e.g.*, daily activities, observations)." *Id.* (citing SSR 96-8p). The Fourth Circuit has held that remand may be appropriate "where an ALJ fails to assess a claimant's capacity to perform relevant functions, despite contradictory evidence in the record, or where other inadequacies in the ALJ's analysis frustrate meaningful review." *Mascio*, 780 F.3d at 636 (citing *Cichocki v. Astrue*, 729 F.3d 172, 177 (2d Cir. 2013)).

Here, the ALJ erred by failing to define or adequately explain the meaning of the limitation "no production rate for pace of work" included in plaintiff's residual functional capacity. At the hearing on May 1, 2018, the ALJ incorporated the limitation "no production rate for pace of work" in the hypothetical he posed to the vocational expert, however he did not indicate what he meant by that term. (AR 70). Although the term "production rate pace"

appears in the Dictionary of Occupational Titles ("DOT") appendix, it is not defined there, nor is the term defined by regulations or case law. *See Thomas*, 916 F.3d at 312. Further, the term is not self-explanatory. *See id.* Without a sufficient explanation by the ALJ as to the meaning of the limitation, the court cannot meaningfully review whether the ALJ's residual functional capacity assessment accounted for all of plaintiff's limitations.

Plaintiff's argument that his case is similar to that of *Thomas* and *Perry* is persuasive here and both cases are instructive. In *Thomas*, the ALJ restricted plaintiff to work without a "production rate or demand pace" but failed to provide an explanation as to what that term meant. *Thomas*, 916 F.3d at 312. The ALJ had included several restrictions accounting for plaintiff's mental and social limitations. *Id.* at 310. For example, plaintiff was able "to follow short, simple instructions, and perform routine tasks," and could have "occasional public contact or interaction and frequent, but not continuous, contact or interaction with coworkers and supervisors." *Id.* She was also to "avoid work involving crisis situations, complex decision making, or constant changes in a routine setting." *Id.* Despite the inclusion of these limitations, however, the Fourth Circuit held that the ALJ's lack of explanation of the term "production rate or demand pace" made it difficult for the court to assess whether this limitation was supported by substantial evidence. *Id.* at 312. The Fourth Circuit followed *Thomas* in *Perry*, decided just a few months later. In *Perry*, the ALJ limited the plaintiff to "unskilled work" that could only occur in a "non-production oriented work setting." *Perry*, 765 F. App'x at 872. The Fourth Circuit found no analogous regulatory definition existed for the phrase "non-production oriented work setting" and it was not a descriptor used commonly in the case law. *Id.* Neither was the phrase self-explanatory. *Id.* Additionally, the ALJ herself offered no explanation of what she meant by the term. *Id.* The Fourth Circuit found this missing explanation all the more important

given the plaintiff's "undisputed" limitations in concentration, persistence, and pace. *Id.* It was clear that such limitations were not accounted for adequately by the ALJ's restriction of plaintiff to "unskilled work," so must have been intended to be addressed by the limitation "non-production oriented work setting." *Id.* Because the Fourth Circuit did not know what the ALJ meant by that term, it was left to "guess" how the ALJ arrived at her conclusions, thus a remand was required. *Id.* at 872–73.

The Commissioner asserts that plaintiff's case is not like *Thomas* or *Perry*, but citing to *Sizemore* as support, contends that the ALJ provided sufficient context for the production-related limitation not only by the "plain words" of the residual functional capacity assessment—namely, that the limitation expressly dictates it applies to the type of pace that plaintiff could perform work at—but also by the record evidence, specifically the evidence which demonstrated plaintiff capable of working at a "sustained basis" given his "normal" attention and concentration. (Docket no. 21 at 26–28). Additionally, the Commissioner points to the ALJ's assignment of a "moderate" rating concerning plaintiff's ability to maintain concentration, persistence, and pace, which, the Commissioner asserts, translates to a finding that plaintiff has a "fair ability" to concentrate, persist, and maintain pace "independently, appropriately, and on a sustained basis." (*Id.* at 27). The Commissioner's argument is unpersuasive, and *Sizemore* is distinguishable. In *Sizemore*, the Fourth Circuit found that the ALJ had adequately explained the plaintiff's residual functional capacity which included a limitation restricting plaintiff to "work only in [a] low stress [setting] defined as non-production jobs [without any] fast paced work [and] with no public contact." *Sizemore*, 878 F.3d at 79, 81. As the Fourth Circuit explained in *Perry*, the court in *Sizemore* held that the ALJ provided additional context by including the descriptors "low stress," "without any fast paced work," and "no public contact" which properly accounted for the

plaintiff's "moderate" limitations in concentration, persistence, and pace. *Perry*, 765 F. App'x at 872, n.1. These descriptors, the court found, helped to explain the ALJ's limitation. *Id.*

By contrast, such context and additional descriptors are missing from the ALJ's residual functional capacity assessment here. The limitation concerning plaintiff's interactions with others—specifically, the restriction of "no more than occasional interaction with supervisors, coworkers, and the general public"—does not have any bearing on the pace or stress level at which plaintiff would be expected to work. (AR 33). The same is true of the limitation restricting plaintiff to jobs with "no more than occasional changes in the work setting that require no more than occasional use of judgment or decision-making." (AR 34). Furthermore, following the decisions in *Thomas* and *Perry*, the limitation restricting plaintiff to jobs "involving simple, routine, and repetitive tasks" (AR 33) does not sufficiently contextualize or help to explain the production-related limitation. *See Kane v. Saul*, No. 3:18cv746, 2019 WL 7562760, at *17 (E.D. Va. Aug. 20, 2019) (citing *Geneva W. v. Comm'r*, No. 18-1812, 2019 WL 3254533, at *3, *8–9 (D. Md. July 19, 2019) and *Ursula G. v. Comm'r*, No. 18-1841, 2019 WL 2233978, at *5–10 (D. Md. May 23, 2019)).

Additionally, contrary to the Commissioner's assertion, the ALJ's inclusion of a production-related limitation in plaintiff's residual functional capacity assessment is not explained or clarified by the evidence in the record. First, the Commissioner refers to the ALJ's finding that plaintiff would have a "moderate" limitation with regard to concentration, persistence, and pace, if the substance abuse stopped. (Docket no. 21 at 24). Per 20 C.F.R. Part 404, Subpart P, Appendix 1, § 12.00(F)(2)(c), a "moderate" limitation is defined as a claimant's "functioning in this area independently, appropriately, effectively, and on a sustained basis is fair." The Commissioner asserts that this "new regulatory guidance," which came into effect on

January 17, 2017, after the ALJ decisions in *Thomas* and *Perry*,[13] clarifies the meaning of a "moderate" degree of limitation and demonstrates "no inherent discrepancy" between a "moderate" rating in concentration, persistence, or pace and a finding that a claimant can perform "simple, routine, and repetitive tasks over the course of a workday." (*Id.* at 25). The substantial evidentiary basis for the ALJ's decision, the Commissioner contends, is not undermined by an additional limitation going beyond the simplicity of the work plaintiff is restricted to perform. (*Id.*). The Commissioner's argument does not directly address the ALJ's failure to define or explain the limitation "no production rate for pace of work." Although a finding of a "moderate" degree of limitation may translate to a determination that plaintiff has a "fair" ability to maintain concentration, persistence, or pace "independently, appropriately, effectively, and on a sustained basis," this does not explain the meaning, or help to clarify, the production-related limitation included by the ALJ in plaintiff's residual functional capacity. In fact, as the Commissioner's argument suggests, the finding of a "moderate" degree of limitation is connected more to the inclusion of restricting plaintiff to "simple, routine, and repetitive tasks." The additional limitation of "no production rate for pace of work" is just that—an additional limitation that requires a sufficient explanation, all the more so when it is not defined elsewhere, such as in the DOT, the regulations, or case law.

Second, the Commissioner points to record evidence showing plaintiff's "attention and concentration [as] normal" and his capability of "meeting the basic mental demands of performing simple work tasks on a sustained basis" as helping to provide the necessary understanding, alongside the ALJ's assignment of a "moderate" rating, of the production-related

---

[13] The Commissioner notes that the dates of the district court filings in *Thomas* and *Perry*, 2016 and the beginning of 2017 respectively, demonstrate that the new rules came into effect after the ALJ's decision in these two cases.

limitation in plaintiff's residual functional capacity assessment. (*Id.* at 26–27). The Commissioner asserts that the Fourth Circuit's holdings in *Thomas* and *Perry* focused on "ambiguities in the ALJ's decisions when viewed in the context of the decision as a whole"— namely, in *Thomas* the ALJ had not explained specific terms *or* the reasoning for the limitation imposed, and in *Perry* the court lacked *any* basis for understanding the ALJ's limitation. (*Id.* at 28) (emphasis in original). Essentially, the Commissioner suggests that the record evidence in this case provides an understanding of the restriction "no production rate for pace of work." The Commissioner's argument fails here too.

A "proper" residual functional capacity analysis includes three components: (1) evidence, (2) logical explanation, and (3) conclusion. *See Thomas*, 916 F.3d at 311. An ALJ's logical explanation is "just as important" as the other two components; if an ALJ's analysis contains too little logical explanation, it frustrates meaningful review. *Id.* Here, contrary to the Commissioner's argument, the ALJ does not provide enough information to understand the meaning of the term "no production rate for pace of work," thereby making it difficult for the court to assess whether its inclusion in plaintiff's residual functional capacity is supported by substantial evidence. Looking to the ALJ's decision as a whole gives no indication as to the ALJ's meaning of the term. Nor does the ALJ illuminate the production-related limitation during the hearing, when he first used the term in the hypothetical he posed to the vocational expert. (AR 70). No further clarity or context is provided by the two phrases that the Commissioner cites to from the record. Reference to plaintiff's "attention and concentration [as] normal" gives no indication as to pace or persistence, thus cannot be understood as a basis from which to understand the meaning of the production-related limitation. Further, the phrase "sustained basis" in reference to plaintiff's capability to "meet[] the basic mental demands of

performing simple work" is not a synonymous term for "no production rate for pace of work." In any case, two citations such as this would not be enough to allow the court to meaningfully assess whether the ALJ constructed a residual functional capacity assessment that adequately accounted for all of plaintiff's limitations.

As the ALJ did not sufficiently define the limitation "no production rate for pace of work," the court cannot meaningfully assess whether a logical bridge exists between the evidence in the record and the residual functional capacity assessment. Accordingly, the court must vacate and remand the ALJ's decision. Upon remand, the assigned ALJ is to provide a more complete explanation as to the reasoning behind the plaintiff's residual functional capacity assessment.

## V. CONCLUSION

Based on the foregoing, the Commissioner's final decision denying benefits for the period of July 1, 2006 through the date of the ALJ's decision on August 7, 2018 is vacated and remanded. The court finds that it cannot meaningfully assess whether a "logical bridge" exists between plaintiff's residual functional capacity and the evidence in the record because the ALJ did not sufficiently define the limitation "no production rate for pace of work" included in the residual functional capacity assessment. Accordingly, plaintiff's motion for summary judgment (Docket no. 13) is granted in part; the Commissioner's motion for summary judgment (Docket no. 19) is denied; and the final decision of the Commissioner is vacated and remanded pursuant to the fourth sentence of 42 U.S.C. §405(g).

Entered this 2nd day of March, 2020.

_____/s/_____
John F. Anderson
United States Magistrate Judge
John F. Anderson
United States Magistrate Judge

Alexandria, Virginia

61